[No. S011425. Aug. 9, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD HAROLD SEATON, Defendant and Appellant.

620

## COUNSEL

James T. Fousekis, Roger R. Myers, Dorothy A. Streutker, Tamara Mason-Williams, Matthew S. Covington and Joshua K. Koltun, under appointments by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood, Adrianne Denault, M. Eugenia Lopez and Matthew C. Mulford, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KENNARD, J.**—A jury convicted defendant Ronald Harold Seaton of one count of murder (Pen. Code, § 187),[1] and it found true special circumstance allegations of robbery murder and burglary murder (§ 190.2, subd. (a)(17)(A) & (G)). The jury also found that defendant had personally used a dangerous or deadly weapon in the commission of the offenses. (§ 12022, subd. (b).) The trial court found that defendant had a prior conviction for a serious felony. (§ 667.) At the penalty phase, the jury returned a verdict of death. Defendant's appeal to this court is automatic. (§ 1239, subd. (b).) We affirm the convictions and the judgment of death.

---

[1]Unless otherwise stated, all further statutory references are to the Penal Code.

## I. Facts

### A. *Guilt Phase—Prosecution's Case*

Willis Jones was a retired auto mechanic living in Riverside, California. He walked with crutches, and at home he moved around in a wheeled chair, but he was otherwise in good physical condition.

Jones's grandson, Mitchell Hayes, lived next door to Jones. On the night of April 25, 1986, Hayes worked at his mother's restaurant until about 10:35 p.m. After leaving work, Hayes saw defendant arguing with his girlfriend, Thelma Garrett, on a street near Hayes's home. Hayes recognized them because he was a friend of Garrett's son and had been to the house where defendant and Garrett lived.

After visiting a friend, Hayes headed home around 12:30 a.m. As he passed Jones's house, he heard loud scuffling noises inside. Through the open door, he entered the living room and saw someone run to the bathroom. Hayes went to the kitchen to get a knife to use as a weapon. Finding none, he entered the bedroom and saw Jones's body. Unsure whether Jones was alive, Hayes telephoned the police by calling 911, the emergency number.

The 911 operator asked Hayes for Jones's address. Hayes could not remember it, so he went outside to look at the number. As he reentered the house, defendant came out of a bedroom, his face masked by a scarf or bandana. Defendant said, "It's not me, man," and hit Hayes across the face. A fight began, during which defendant's mask fell off. Hayes broke free from defendant and ran into the street. Defendant then ran off in the direction of his own house.

Hayes went home and told his brother-in-law, Robert Pead, what had happened. Pead went to Jones's house next door and found him lying on his bedroom floor with a hammer on his chest. He was not breathing.

When police officers arrived, Hayes told them defendant had attacked him and directed them to defendant's house. The officers rang the doorbell. After five to 10 minutes 12-year-old Latisha Garrett, the daughter of defendant's girlfriend, came to the door, followed shortly thereafter by defendant, who was then arrested. The police searched the house. They found a pair of bloodstained pants in the attic and a bloody pillowcase in defendant's bedroom. There were bloodstains on a bathroom towel and a spot of blood on the bathroom sink. A wet pair of men's undershorts, stained with blood, was hanging on a balcony railing, and a wet pair of men's tennis shoes was inside a bedroom cupboard.

Jones's bedroom had been ransacked. Bloody shoe prints were on the bedroom floor, on a drawer that had been pulled out of the dresser, and on items of clothing strewn on the floor. A suitcase on Jones's bed contained a bloody hammer. Edith Hayes, Jones's daughter, did not recognize the hammer as belonging to her father.

Also on the bed were a radio, a bloody pillow, a cardboard box, a tire iron, Jones's wallet, and papers that appeared to have been removed from the wallet. Some of Jones's property (a small television set, a fan, an electric drill, a package of ribs from the freezer, and two butcher knives) was stacked next to the front door, along with a pocketknife that did not belong to Jones.

Dr. DeWitt Hunter performed an autopsy on Jones's body. Jones had 44 crush-type lacerations to his face and head. Most of the wounds were consistent with having been made by a blunt object such as a hammer, but several cuts behind his ear and on his hands appeared to have been caused by a knife.

Based on Dr. Hunter's examination of blood patterns depicted in photographs of the scene, he concluded that Jones had suffered two separate attacks: one at the head of the bed, where he probably lay bleeding for between five and 15 minutes, and the other at the foot of the bed where his body was found. Dr. Hunter also concluded that Jones was alive during the second attack. This conclusion was based in large part on his observation of what appeared to be clotted blood at the foot of the bed, and his belief that blood that flows from a wound while the victim is alive tends to clot, while postmortem blood does not. Faye Springer, a criminalist with the California Department of Justice, agreed with Dr. Hunter that Jones had been attacked twice, based on her examination of photographs of the scene that depicted the blood splatter patterns on the walls, ceiling, and furniture in the room. She expressed no view on whether Jones was alive during the second attack.

Based on photographs of Jones's body, criminalist Springer concluded that two incisions on Jones's left forehead were consistent with having been made with the claw end of the hammer found at the scene, and that another mark on his head appeared to be a stab wound. She also conducted tests on the bloodstained pants found in defendant's attic. She testified that the blood in the stains was not defendant's, that it contained characteristics present in only .03 percent (3 in 10,000) of the Black population, and that Jones's blood had those characteristics. Springer also testified that the bloody shoe prints on Jones's floor were of the same size and tread design as the wet tennis shoes found in defendant's bedroom cupboard.

B. *Guilt Phase—Defense Case*

Defendant admitted killing Jones, but he claimed he did so in a sudden quarrel or heat of passion, not in the commission of a burglary or robbery. He testified that on the evening of the killing he went with his girlfriend Thelma Garrett to buy groceries and gin. On their way home, Garrett stopped at Jones's house and said she was going to borrow money from Jones. She asked defendant to take the groceries home and feed her children, then to return to Jones's house to escort her home. Defendant did so. Back at Jones's house, he saw Garrett, naked, standing between Jones's legs. Defendant was angry and wanted to hurt Garrett and Jones. After he and Garrett left Jones's house they argued, and defendant "body-slammed" Garrett, throwing her to the ground. At Garrett's suggestion, she and defendant then used the $24 Jones had loaned her to buy cocaine. They went home, smoked the cocaine, and shared a pint of gin. Defendant drank most of the gin, and he also drank a quart of beer.

Defendant continued to argue with Garrett. Finally, he told her he was going to play chess. Instead, he went to Jones's house to ask what had happened between Jones and Garrett. There, he drank some of Jones's homemade wine. As they talked, Jones called Garrett a "bitch," and defendant, angry, hit Jones with his fist. Jones fell on the bed, then sat up with a hammer in his hand. Defendant grabbed the hammer and hit Jones with it until Jones stopped moving.

When he realized Jones was dead, defendant panicked, and decided to make it appear as if Jones had been robbed. He ransacked the house and stacked items belonging to Jones next to the door. He threw Jones's body on the floor, took his wallet, and dumped the contents on the bed. When he was about to leave, he saw Mitchell Hayes in front of the house. When defendant went out the front door, Hayes attacked him. Defendant denied wearing a mask during the fight.

Defendant admitted prior felony convictions for robbery and assault with a deadly weapon.

Thelma Garrett testified on defendant's behalf. Her testimony mirrored defendant's in most respects. In explaining why she had taken her clothes off at Jones's house, she said she had occasionally worked as a prostitute, but maintained that defendant had not known she did, thus explaining his anger when he saw her with Jones. On rebuttal, Riverside Police Officer Ronald Mackey testified that Garrett had made a tape-recorded statement to him admitting that defendant had known she was a prostitute.

Dr. Irving Root, a pathologist who had performed more than 18,000 autopsies, challenged the testimony of Dr. DeWitt Hunter, the pathologist who had testified for the prosecution. Dr. Root disagreed that certain cuts on Jones's head were knife wounds, concluding that they most likely were inflicted by the claw end of a hammer. He also disagreed with Dr. Hunter's testimony that Jones was attacked at two separate locations in the bedroom and was probably alive at the time of the second attack. In Dr. Root's view, the lack of bleeding under the skull was evidence that many of the head wounds occurred when Jones was dying or dead. He explained that Dr. Hunter was wrong in stating that blood flowing from the body after death does not clot. In Dr. Root's opinion, Jones became unconscious within a minute after defendant began hitting him and he died within five minutes, before he was moved to the second location. The large pool of blood at the location of the alleged second assault, he testified, had simply drained from the body, and it was not "medically reasonable" that an attack occurred there.

### C. Penalty Phase—Prosecution's Case

The prosecution presented evidence that on September 5, 1980, defendant and another man entered the Lucky Greek restaurant in Riverside and demanded money. Defendant wore a stocking over his head and carried a knife that he held next to the neck of dishwasher Alberto Gil. The other robber was armed with a sawed-off shotgun. Co-owner George Zois took money from the cash register and handed it to the robbers, who fled. Riverside police officers quickly arrested them, and retrieved the gun and an unspent shotgun shell from the bushes where defendant had thrown them. Defendant entered a plea of no contest to felony charges of robbery and assault with a deadly weapon.

The prosecution introduced evidence that defendant had three other prior felony convictions: two counts of second degree burglary in Riverside County in 1964, and one count of larceny from the person in Michigan in 1967.

### D. Penalty Phase—Defense Case

Warren Seaton, one of defendant's younger brothers, testified he and defendant grew up in a large family that included 18 children, some of whom were half brothers and sisters. Defendant treated Warren well. When their parents separated in 1963, some of the children, including Warren and defendant, were left to fend for themselves. Warren, who was 12 years old at the time, lived on the streets, eating from trash cans and sleeping in empty houses, until his mother found him several months later.

The brother, sister and 13-year-old son of Thelma Garrett, defendant's girlfriend, each testified that defendant treated Garrett well and was a loving father to Garrett's children, and that the children were happy and well fed even when defendant and Garrett were using drugs. This testimony was corroborated by Warren Seaton and his wife.

Dr. Edward Conolley, a clinical psychologist, performed a psychological assessment of defendant. He concluded that defendant suffered from an anxiety disorder, which he described as an "atypical combination of avoidant, paranoid, and borderline" personalities. Defendant experienced chronic anxiety about his relationships with women and had been affected by many years of substance abuse. Defendant had an IQ of 80, which Dr. Conolley described as "substantially lower than average."

According to Dr. Conolley, defendant's chronic anxiety about his relationships with women was increased when he saw Thelma Garrett, his girlfriend, in a sexually suggestive position with the victim, Willis Jones. These fears were exacerbated by Jones's comments about Garrett and by the cocaine and alcohol defendant had ingested shortly before he killed Jones. As a result, defendant suffered from "impaired judgment and poor quality of psychological thought processes" on the night of the murder. In Dr. Conolley's view, defendant would do well in a structured prison setting.

## II. GUILT PHASE ISSUES

### A. *Pretrial Issues*

#### 1. *Motion to suppress evidence*

Shortly after the murder of Willis Jones, police officers went to defendant's house and arrested him when he came to the front door. The officers then briefly walked through the house, finding a bloody fingerprint in plain sight on a dresser or bookcase in an upstairs hallway. They then obtained a search warrant, relying on the bloody fingerprint as part of their showing of probable cause to search. On searching the house further, they found additional incriminating evidence.

Defendant moved to suppress this evidence, contending the initial search of the house was illegal, rendering the later search illegal as the "fruit" of that earlier search. The trial court denied the motion, citing three grounds: (1) The search was justified by an exigent circumstance—the need to prevent the destruction of evidence on the premises; (2) even if the warrant application had not mentioned the bloody fingerprint, there would

have been probable cause to issue a search warrant, and therefore the evidence obtained in the warrant search derived from an independent source; (3) even if the initial warrantless search violated the Fourth Amendment, the police officers had acted in good faith in conducting that search. Defendant challenges each of these reasons. Because we agree with the trial court that exigent circumstances justified the search, we need not discuss the second and third grounds.

"One established exception to the warrant requirement . . . is when 'exigent circumstances' exist to justify a warrantless entry." (*People v. Wharton* (1991) 53 Cal.3d 522, 577 [280 Cal.Rptr. 631, 809 P.2d 290].) For instance, a police officer who has probable cause to believe a dwelling contains evidence of a crime and has reason to fear imminent destruction of the evidence may enter the dwelling to "secure" it without first getting a warrant. (*People v. Bennett* (1998) 17 Cal.4th 373, 384-385 [70 Cal.Rptr.2d 850, 949 P.2d 947].)

Here, police had probable cause to believe defendant's house contained evidence linking defendant to the just-committed murder of Willis Jones. Arriving at the scene of a homicide, they learned that a man had just been beaten to death, that defendant had attacked the man's grandson when he entered the man's house after hearing a disturbance, and that defendant had thereafter fled the scene. Thirty minutes thereafter, after the grandson had brought them to defendant's home, they knocked on defendant's door. No one answered for five to 10 minutes, during which time they heard noises that sounded like objects being moved. Based on these circumstances, the officers could reasonably fear that unless they entered, persons in the house would destroy evidence.

As one commentator has explained: "[I]f the exigent circumstance being responded to is the possibility that there may be other persons within the premises who might destroy evidence, then the logical first step is a 'sweep' of those premises to see if in fact anyone else is present. If no one is found, then the exigency has ended and the police should then merely maintain control of the premises while a search warrant is obtained . . . ." (3 LaFave, Search and Seizure (3d ed. 1996) § 6.5(b), p. 353, fn. omitted.) That is precisely what occurred here: The officers made a cursory sweep through defendant's house, which took no more than three minutes, after which they obtained a warrant before conducting a more thorough search. We therefore agree with the trial court that the initial search was proper. As a result, the officers' observation of the bloody fingerprint did not violate the Fourth Amendment and use of that observation in the warrant application was permissible.

Defendant also challenges the validity of the search warrant because it was signed by a magistrate who, defendant says, had a conflict of interest. In 1980, as a deputy in the Riverside County District Attorney's Office, the magistrate had prosecuted defendant for a felony. The magistrate was later elevated to the superior court and assigned to preside over defendant's capital trial, but he recused himself when the 1980 matter was brought to his attention. Defendant did not move to quash the search warrant, however, when he learned of the magistrate's alleged conflict of interest. His failure to do so precludes him from raising the issue for the first time on appeal.

### 2. *Speedy trial*

■ Defendant was arrested on April 26, 1986. Jury selection in his trial began on September 26, 1988. He contends the 29-month delay between arrest and trial violated his federal constitutional right to a speedy trial.

Defendant's case was continued many times, sometimes at defendant's request, sometimes at the request of the prosecution. On each occasion defendant waived his right to a speedy trial during the period for which the continuance was granted. At no time did he object to any continuance or move to dismiss on the ground that the state had violated his speedy trial right. As a result, defendant failed to preserve his right to a speedy trial under *California* law. (*People v. Wright* (1990) 52 Cal.3d 367, 389 [276 Cal.Rptr. 731, 802 P.2d 221].) But defendant maintains, relying on *Barker v. Wingo* (1972) 407 U.S. 514 [92 S.Ct. 2182, 33 L.Ed.2d 101] (*Barker*), that he did not give up his right to assert that the delay in bringing him to trial violated his *federal* constitutional right to speedy trial. As we shall explain, he is wrong.

In *Barker*, the United States Supreme Court considered the "demand" rule, then prevalent in most states, which required defendants to affirmatively object to a continuance to preserve the right to claim the continuance violated the right to speedy trial. The high court rejected the demand rule, explaining that a defendant's mere silence in the face of a continuance does not waive the constitutional right to speedy trial because a waiver occurs only when there is a conscious relinquishment of a known right. (*Barker, supra*, 407 U.S. 514, 525-528 [92 S.Ct. 2182, 2189-2191].) It held that in determining whether the prosecution's failure to promptly bring a defendant to trial violated the defendant's speedy trial right, courts must evaluate four factors: the length of delay, the reason for the delay, the defendant's assertion of the right, and prejudice to the defendant. (*Id.* at p. 530 [92 S.Ct. at pp. 2191-2192].)

Under *Barker, supra*, 407 U.S. 514, 528 [92 S.Ct. 2182, 2191], if defendant had *remained silent* when the trial court granted the prosecution's

motions to continue his case, he could still have maintained on appeal that the continuances violated his federal constitutional right to speedy trial. But defendant did not simply remain silent. Each time the trial court continued the case, he either sought the continuance or personally "waived time": that is, he formally and knowingly relinquished his right to a speedy trial for the period covered by each continuance. As a result, he may not assert on appeal that the state violated that right.

### B. Jury Selection Issues

#### 1. Underrepresentation of racial and ethnic minorities in the jury pool and jury panels

■ Defendant contends Riverside County's jury selection method resulted in a unconstitutional underrepresentation of Black and Hispanic persons in the jury pool and the panels from which his jury was drawn. He did not raise this issue in the trial court, although his counsel was aware of ongoing proceedings in other cases challenging Riverside County's juror selection practices on this ground. (See generally *People v. Jackson* (1996) 13 Cal.4th 1164, 1192-1195 [56 Cal.Rptr.2d 49, 920 P.2d 1254] [discussing challenges to Riverside County juror selection practices at the time of defendant's trial].) He therefore relies on evidence outside the record to support this claim, asserting he is entitled to do so because the information was unavailable to him at the time of trial. Because defendant relies on evidence outside the record, his claim is not properly before us in this appeal. The same of true of his related argument that trial counsel was ineffective for failing to preserve the jury cross-section claim.

#### 2. Juror comments during jury selection

■ During jury selection, one prospective juror said the justices of this court were "wasting their time" in deciding capital appeals, and he "did not believe in the judicial system" because "[i]f a person is found guilty by his peers, he should get the death penalty." Another prospective juror said that if a defendant was brought to trial, "you may as well be done with them right away." Neither was selected to sit on the jury. Nevertheless, defendant contends the other prospective jurors who *heard* these comments could not be fair, and that he was therefore denied a trial by an impartial jury.

Defendant has not preserved this issue for appeal, because he did not challenge for cause the prospective jurors who heard these comments. Had he done so, however, the challenge would not have been meritorious. Occasional criticism of the judicial system by prospective jurors is an

inevitable by-product of voir dire. When, as here, the critical comments are isolated and do not pertain to the facts of the offense charged, the prospective jurors who hear them are rarely if ever "contaminated" to such a degree that they cannot be fair. Moreover, defendant acknowledges that none of the jurors who participated in deliberations heard the prospective jurors' views. Defendant points out that a juror who sat through most of the trial (but was excused before deliberations) heard one comment and an alternate juror heard the other, but the record provides no support for his speculation that either of them mentioned the statements to the jurors who decided the case.

3. *Improper questions to jurors about their attitudes regarding the death penalty*

■ Defendant asserts the trial court erred and the prosecutor committed misconduct during the individualized questioning of prospective jurors about their attitudes regarding the death penalty. Because defendant did not object at trial, he has not preserved these issues for appeal. (*People v. Medina* (1995) 11 Cal.4th 694, 741 [47 Cal.Rptr.2d 165, 906 P.2d 2].) Moreover, as we shall explain, even if he had preserved the claims, they lack merit.

Defendant argues that during the questioning, the trial court made comments implying it believed defendant was guilty of murder, that he used a hammer in committing the murder, and that the special circumstance findings were a foregone conclusion. These comments, he contends, directed the jury to convict him of capital murder. We disagree. The court described the role of a jury in a capital trial, explaining that a penalty phase would result *if* the jury convicted defendant of first degree murder and found at least one special circumstance allegation true. It never implied a belief in defendant's guilt. Defendant's argument to the contrary is based on quotations from isolated fragments of the court's comments, misleadingly taken out of context.

Defendant also contends the prosecutor's comments during this phase of voir dire predisposed the jury to return a death verdict if the trial resulted in a penalty phase. In describing the penalty phase of trial, the prosecutor gave illustrations of aggravating and mitigating evidence. As an example of aggravating evidence, he often mentioned a hypothetical defendant with a history of many prior felony convictions. To illustrate mitigating evidence, he often mentioned a hypothetical defendant who had received the Congressional Medal of Honor, was a war hero, had saved someone's life, or had no prior criminal history. The trial court used similar illustrations.

Defendant points out that the illustrations of aggravating evidence used by the prosecutor and the trial court resembled the aggravating evidence actually presented by the prosecution in this case, whereas the illustrations of

mitigating evidence were wholly unlike defendant's mitigating evidence. He argues the illustrations were faulty in three respects: (1) The examples of aggravating evidence improperly drew on the facts of this case (see *People v. Pinholster* (1992) 1 Cal.4th 865, 915-918 [4 Cal.Rptr.2d 765, 824 P.2d 571]); (2) the illustrations indoctrinated the jury to disregard defendant's mitigating evidence (which was not comparable to the mitigating evidence described in the illustrations) and to give greater weight to the prosecution's aggravating evidence (which was comparable); (3) the illustrations restricted the jury's consideration of defendant's mitigating evidence, and diverted its attention to irrelevant factors.

Our observations in *People v. Medina, supra*, 11 Cal.4th 694, 741, where the prosecutor gave illustrations similar to those used by the trial court and the prosecutor in this case, are pertinent: "The prosecutor's statements, though somewhat simplistic, were not legally erroneous, and defendant had ample opportunity to correct, clarify, or amplify the prosecutor's remarks through his own voir dire questions and comments. [¶] Moreover, as a general matter, it is unlikely that errors or misconduct occurring during voir dire questioning will unduly influence the jury's verdict in the case. Any such errors or misconduct 'prior to the presentation of argument or evidence, obviously reach the jury panel at a much less critical phase of the proceedings, before its attention has even begun to focus upon the penalty issue confronting it.' " (*Ibid.*)

Equally meritless are defendant's claims that the prosecutor suggested the result here was a foregone conclusion by saying that even Jack Ruby (whose killing of Lee Harvey Oswald was broadcast on national television) had the right to a jury trial, or that the prosecutor improperly bolstered the credibility of police officers and denigrated the credibility of mental health professionals. The cited remarks were within the scope of permissible voir dire.

The trial court told some prospective jurors that if the aggravating circumstances were so substantial compared to those in mitigation that the death penalty was appropriate, the jury "will" return a verdict of death. Defendant argues these comments inaccurately described the jury's task at the penalty phase of trial, citing footnote 16 of *People v. Brown* (1985) 40 Cal.3d 512, 544 [230 Cal.Rptr. 834, 726 P.2d 516]. In *Brown* we said that an instruction using similar language was potentially misleading and should be clarified, but we did not say it was inaccurate. In any event, here the court was conducting voir dire, not instructing the jury; its comments "were not intended to be, and were not, a substitute for full instructions at the end of trial." (*People v. Edwards* (1991) 54 Cal.3d 787, 840 [1 Cal.Rptr.2d 696, 819 P.2d 436].) In this context, the court's comments were proper.

#### 4. *Rulings on challenges for cause*

 Defendant argues the trial court erroneously denied seven of his challenges for cause that were based on prospective jurors' views on the death penalty. As the United States Supreme Court has explained, a prospective juror whose views on the death penalty would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath' " should be excluded for cause. (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [105 S.Ct. 844, 852, 83 L.Ed.2d 841]; see also *People v. Earp* (1999) 20 Cal.4th 826, 853 [85 Cal.Rptr.2d 857, 978 P.2d 15].) If a prospective juror's answers to questions are conflicting or equivocal, we defer to the trial court's evaluation of the prospective juror's state of mind. (*People v. Mendoza* (2000) 24 Cal.4th 130, 169 [99 Cal.Rptr.2d 485, 6 P.3d 150]; *People v. Mincey* (1992) 2 Cal.4th 408, 456 [6 Cal.Rptr.2d 822, 827 P.2d 388].)

To preserve the right to assert on appeal that the trial court wrongly denied a challenge for cause, a defendant must (1) exercise a peremptory challenge to remove the juror in question, (2) use all of his or her peremptory challenges, and (3) communicate to the court dissatisfaction with the jury selected. (*People v. Crittenden* (1994) 9 Cal.4th 83, 121 [36 Cal.Rptr.2d 474, 885 P.2d 887].) Here, defendant satisfied the first two of these requirements, but not the third. Counsel explained that he believed he had the right to ask the court to grant him additional peremptory challenges, but that he had chosen not to do so, partly for "tactical reasons" and partly "because Mr. Seaton feels that he would like to have these 12 people hear his case." As a result, defendant may not assert on appeal that the trial court should have granted his challenges for cause.

#### 5. *Nonrandom selection process*

 After the voir dire process had identified a pool of 88 prospective jurors who were not subject to exclusion for hardship or challenge for cause, the parties met on October 27, 1988, to select a jury. The clerk read the first 12 names from the list of 88 prospective jurors. When the prosecution or defense exercised a peremptory challenge, the clerk read the next name on the list. In this manner a jury was selected, but because the prospective jurors were not present, the jury was not sworn, nor were the alternates selected.

The next day, defendant told the court he had discovered that the list of names read by the clerk had not been scrambled, but had been based on the order in which the jurors had been questioned during voir dire. He objected

that the jury list had not been randomly selected. The court and the parties discussed the matter at length, after which the court recessed without ruling on the objection. When proceedings resumed the following week, defendant said he had decided not to move for a mistrial based on the problems in the selection process and was willing to have the case heard by the 12 jurors who had been selected.

Defendant argues this method of jury selection violated Code of Civil Procedure sections 191, 198, and 222, which require jury selection to be random. But defendant waived his objections to the selection process, so he may not challenge it on these grounds on appeal. (*People v. Visciotti* (1992) 2 Cal.4th 1, 37-38 [5 Cal.Rptr.2d 495, 825 P.2d 388].) Defendant claims his waiver was coerced by a beating inflicted by guards at the jail where he was housed pending trial, but as proof of these beatings he relies on exhibits in an action he filed in federal court against the Riverside County Sheriff's Department. These exhibits are not part of the record in this case, so any claim pertaining to them must be raised on habeas corpus. (*People v. Bean* (1988) 46 Cal.3d 919, 944 [251 Cal.Rptr. 467, 760 P.2d 996].)

Defendant points out that, of the four Black and 11 Spanish-surnamed persons in the pool of 88 prospective jurors, only one Black person and six Spanish-surnamed persons were among the names called by the clerk; the others were not called because they were among the last jurors questioned in voir dire. He contends that as a result, the selection process described above denied him the right to a jury from a fair cross-section of the community, in violation of the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. Defendant's failure to object on these grounds at trial bars him from asserting them on appeal. (*People v. Davenport* (1995) 11 Cal.4th 1171, 1195 [47 Cal.Rptr.2d 800, 906 P.2d 1068].) Moreover, an objection would have been futile, because there is no evidence that the jury selection process *systematically* excluded any racial or ethnic group. (See *Duren v. Missouri* (1979) 439 U.S. 357, 364 [99 S.Ct. 664, 668-669, 58 L.Ed.2d 579].)

### 6. *Removal of juror*

Defense counsel's closing argument in the guilt phase of trial began on December 7, 1988. During a recess in the middle of the argument, the bailiff reported that Juror M. had a runny nose and Juror C. felt drowsy and believed she was coming down with the flu. The trial court adjourned for the day and questioned the two jurors. Juror M. said her illness was not serious, but Juror C. said she had been "throwing up everything" and needed rest. Defense counsel noted that Juror C. had caused "a lot of inconveniences," and said if she was unable to continue the following day, he would stipulate that she could be excused.

The following day, the bailiff reported that Juror C. felt "not too good," but better than the day before. Defense counsel again offered to stipulate to her removal. The court questioned C., who said she was "half and half," but was not drowsy, was not taking any medication, and was able to continue. After C. left the room, the trial court commented: "Well, you can still stipulate [to C.'s dismissal], but she sounds a lot—looks a lot better, acts a lot better." Defense counsel, however, said he was still willing to stipulate that the court should excuse C., noting that "[s]he's caused problems before." The prosecutor joined in the stipulation, and the court excused her.

Defendant now argues the trial court lacked good cause to dismiss Juror C., and the dismissal violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution, their counterparts in the California Constitution, and section 1089, which provides that the court may discharge a juror who "dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his duty . . . ." Any error, however, was invited by defense counsel, who stipulated that the court could excuse C.

Defendant speculates that his counsel stipulated to the dismissal of C., the only Black juror on the panel, because counsel's wife was expecting a child in two weeks, and he therefore wanted to end the trial as soon as possible. Defendant argues counsel's desire to be with his wife and child was not good cause to excuse C. and, by asking the court to remove her, counsel violated his duty to avoid conflicts of interest. But counsel never gave this explanation for his willingness to stipulate. Indeed, the previous day counsel had unsuccessfully sought a one-day continuance to work on his closing argument (see pt. II.C.12., *post*), showing that he was not trying to rush through the trial. Counsel may have believed that C. would not participate actively in the deliberations because of her illness, or that it was otherwise in defendant's best interests to stipulate to her dismissal.

### 7. Cumulative jury selection error

Defendant argues that; considered cumulatively, the errors in jury selection violated his right to a fair trial. Because we have found no errors, his claim of cumulative error fails.

### C. Trial Issues

#### 1. Claims pertaining to the prosecutor's two-beating theory

 Willis Jones's grandson, Mitchell Hayes, testified that he heard "a bunch of scuffling," in Jones's house just before he entered, which, the

prosecutor contended, could have been the sound of a second beating of Jones that occurred after defendant had stacked Jones's property next to the front door. Two prosecution experts, Dr. Hunter and criminalist Springer, testified that Willis Jones was probably beaten at two different locations in his bedroom, and Dr. Hunter also testified that Jones was still alive at the time of the second beating.

In his closing argument, the prosecutor argued the jury could convict defendant of first degree felony murder and could find the felony-murder special-circumstance allegations true if it believed that either of two alternate scenarios occurred: Defendant came to Jones's house without intending to steal, but after administering the first beating, defendant decided to loot Jones's home and began stacking Jones's property next to the door, after which he administered the final, fatal beating; defendant had decided to steal from Jones before he arrived at the house, and he killed Jones to accomplish the theft. Defendant raises several claims of error arising from the prosecutor's reliance on the first scenario, which he calls the "two-beating theory."

 a. *Prosecution's asserted failure to give notice or provide discovery of evidence supporting its theory of felony murder*

Defendant maintains the prosecutor gave him constitutionally inadequate notice of the two-beating theory. He points out that there was no testimony at the preliminary hearing that he inflicted two separate beatings on Jones, and that the first reference to this theory in the record occurred when jury selection was almost complete, when the prosecutor mentioned it during a hearing on the admissibility of certain photographs taken at the murder scene.

 Both the Sixth Amendment of the federal Constitution and the due process guarantees of the state and federal Constitutions require that a criminal defendant receive notice of the charges adequate to give a meaningful opportunity to defend against them. (U.S. Const., 6th Amend. ["the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation"]; *id.*, 14th Amend.; Cal. Const., art. I, § 15.) "Notice of issues to be resolved by the adversary process is a fundamental characteristic of fair procedure." (*Lankford v. Idaho* (1991) 500 U.S. 110, 126 [111 S.Ct. 1723, 1732, 114 L.Ed.2d 173].) "The 'preeminent' due process principle is that one accused of a crime must be 'informed of the nature and cause of the accusation.' [Citation.] Due process of law requires that an accused be advised of the charges against him so that he has a reasonable opportunity to prepare and present his defense and not be taken by surprise by evidence

offered at his trial." (*People v. Jones* (1990) 51 Cal.3d 294, 317 [270 Cal.Rptr. 611, 792 P.2d 643].)

 Here, assuming for the sake of argument that defendant's right to receive notice of the charges included the right to pretrial notice of the prosecution's two-beating theory, defendant never objected to the lack of notice at trial, nor did he seek a continuance to prepare sufficiently to respond to the theory. As a result, he has not preserved the right to assert the lack of notice on appeal.

Moreover, even if the prosecutor was required to disclose the two-beating theory before trial, defendant was not prejudiced by learning of it during jury selection. Defendant vigorously cross-examined the prosecutor's expert witnesses who presented the two-beating theory, and called his own expert, Dr. Root, who rebutted their testimony. The record contains no evidence that Dr. Root's testimony was affected by the lack of earlier notice or that the defense could have developed any other more persuasive rebuttal had it received earlier notice.

Defendant contends the prosecution was required to give the defense notice of its two-beating theory before the preliminary hearing, and by failing to do so the prosecution "ambushed" the defense, thereby violating defendant's right to due process of law under the Fourteenth Amendment to the federal Constitution. Not so. There is no evidence here that at the time of the preliminary hearing the prosecution planned to rely on the two-beating theory at trial, knew that the evidence it had gathered might support the theory, or had learned that its experts were prepared to testify in support of the theory. Thus, even assuming that the prosecutor would have been obligated to disclose this theory had he been aware of it, he certainly was not required to disclose facts or theories of which he was unaware.

Defendant asserts the prosecution failed to provide him discovery regarding the two-beating theory. His failure to raise this claim at trial bars him from asserting it on appeal. At any rate, he fails to show that the prosecution failed to provide him with any discoverable materials in its possession pertaining to the two-beating theory.

b. *Trial court's failure to ensure that defense counsel was prepared to defend against the two-beating theory*

Defendant asserts that when the prosecutor mentioned during voir dire that he intended to argue the two-beating theory, the trial court should have ascertained that defense counsel was prepared to defend against that theory,

and that by failing to do so, the trial court violated defendant's Fourteenth Amendment right to due process and his Sixth Amendment right to notice, counsel, and confrontation. To support this claim, defendant relies on *Powell v. Alabama* (1932) 287 U.S. 45 [53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527]. There, the high court held that a trial court violated the defendants' due process rights by permitting a capital trial to go forward six days after the defendants were indicted and on the same day that attorneys were appointed to represent them at trial, even though the attorneys did not seek a continuance. Here, by contrast, defense counsel was appointed more than *two years* before trial, and the trial court had no reason to believe he was not prepared to proceed. Thus, no inquiry was called for.

▮ Defendant also contends the trial court inquired whether defense counsel had a conflict of interest arising from his wife's pregnancy, a circumstance that might cause counsel to rush through the trial so he could be with his wife and the new baby. As defendant points out, when a trial court knows, or reasonably should know, that defense counsel and the client may have a conflict of interest, it must inquire into the matter. (*People v. Jones* (1991) 53 Cal.3d 1115, 1136 [282 Cal.Rptr. 465, 811 P.2d 757].)

Here, defense counsel told the trial court that he and the prosecutor had agreed if the trial was still in progress when the baby was born, it would be postponed to give counsel a little time off. The baby was due on December 21, 1988, so the planned postponement coincided with the Christmas holiday. The jury returned its verdict on December 9, 1988, and the court postponed the start of the penalty phase until January 3, 1989. Under these circumstances, the trial court could reasonably conclude that defense counsel's personal needs had been accommodated, and it had no duty to inquire further.

c. *Admissibility of expert testimony*

▮ As previously mentioned, Dr. Hunter and criminalist Springer testified that Willis Jones was probably beaten at two different locations in his bedroom, and Dr. Hunter also testified that Jones was still alive at the time of the second beating. The prosecutor relied on that testimony as evidence of his two-beating theory.

Defendant asserts this testimony was inadmissible because it lacked adequate scientific foundation for the admissibility of expert scientific evidence. (See *People v. Leahy* (1994) 8 Cal.4th 587 [34 Cal.Rptr.2d 663, 882 P.2d 321]; *People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; but see *People v. Stoll* (1989) 49 Cal.3d 1136, 1156-1157 [265

Cal.Rptr. 111, 783 P.2d 698] [*Kelly* rule applies only to a "technique, process, or theory which is *new* to science," that "effectively blindsides the jury"].) Because defendant did not object on this ground at trial, he cannot now raise this issue on appeal. (*People v. Diaz* (1992) 3 Cal.4th 495, 527-528 [11 Cal.Rptr.2d 353, 834 P.2d 1171].)

Defendant contends his failure to object should be excused because he lacked advance notice of the content of the testimony by Dr. Hunter and criminalist Springer, and he could not know their testimony would be based on unreliable scientific techniques until after they had testified. Assuming for the sake of argument that he lacked adequate notice, defendant could have asked for an offer of proof before Dr. Hunter and criminalist Springer testified; alternatively, as soon as they had finished testifying he could have objected and asked the trial court to strike their testimony. He did neither.

Relying on *People v. Coleman* (1988) 46 Cal.3d 749, 778 [251 Cal.Rptr. 83, 759 P.2d 1260], defendant contends that this court will overlook a party's failure to object to the admission of evidence when necessary to prevent a miscarriage of justice, and he asks us to do so here. But *Coleman* does not so hold. Rather, it addresses whether, in unusual circumstances where the interests of justice require, this court can overlook a "technical flaw" in the form of an objection. (*Id.* at p. 777; but see *People v. Diaz, supra,* 3 Cal.4th 495, 527 [noting that the authority for overlooking technical flaws in the form of an objection originated in a plurality opinion, which later cases have cited only for the purpose of finding it distinguishable].) The problem here is not that defendant made a technically insufficient objection, but that he made no objection at all.

Defendant asserts his trial counsel's failure to object to the testimony of Dr. Hunter and criminalist Springer was ineffective assistance of counsel. Because the record does not reveal why counsel did not object, this claim rests on facts outside of the record, and may only be raised on habeas corpus. (*People v. Lucero* (2000) 23 Cal.4th 692, 728-729 [97 Cal.Rptr.2d 871, 3 P.3d 248].)

### d. *Legally and factually insufficient theory*

The prosecutor urged the jury to convict defendant of first degree felony murder and to find both the robbery-murder and the burglary-murder spe-cial-circumstance allegations to be true if it believed the two-beating theory (defendant came to Jones's house without intending to steal, but after administering the first beating, he decided to loot Jones's home and began stacking Jones's property next to the door, after which he administered the

final, fatal beating), or if it believed that defendant had decided to steal from Jones before he arrived at the house, and he killed Jones to accomplish the theft.

Defendant argues the two-beating theory was both legally and factually insufficient, thus requiring reversal of his murder conviction and the special circumstance findings.

Defendant first contends the two-beating theory was legally insufficient to establish that the killing occurred in the course of a *robbery*. He relies on *People v. Green* (1980) 27 Cal.3d 1 [164 Cal.Rptr. 1, 609 P.2d 468] (*Green*). There, we explained: "[A] conviction of robbery cannot be sustained in the absence of evidence that the accused conceived his intent to steal either before committing the act of force . . . or during the commission of that act; if the intent arose only after he used force against the victim . . . the taking will at most constitute a theft." (*Id.* at pp. 52-53, italics omitted.) According to defendant, *Green* holds that whenever a killer has rendered a victim unconscious and dying for a reason other than theft, and the killer then takes advantage of the situation to steal from the victim, the killer is not guilty of robbery. Thus, he maintains, if he knocked Jones unconscious in the first beating, he did not commit a robbery if he thereafter formed the intent to steal.

Defendant, however, misconstrues our decision in *Green, supra*, 27 Cal.3d 1. Under *Green*, when a killer's *only* assaultive conduct occurs *before* forming the intent to steal, a robbery has not occurred, because there is no union of act and larcenous intent. But if a killer wounds the victim, then decides to steal, and *thereafter* finishes off the victim to accomplish this purpose, the perpetrator has committed robbery, because at the time of the second attack the killer's larcenous intent coincides with acts of force against the victim. Thus if, as the prosecutor theorized here, defendant first attacked Jones without the intent to steal, and he then decided to steal and finished Jones off to achieve this goal, he was guilty of robbery. Therefore, the prosecutor's two-beating theory was *legally* sufficient to support defendant's conviction of first degree murder under the felony-murder rule (because the killing occurred in the commission of a robbery) and was *legally* sufficient to support the jury's finding that the killing occurred in the course of a robbery.

Defendant also asserts the two-beating theory was *factually* insufficient to support a finding that the killing occurred in the course of a robbery; that is, he argues there was no credible evidence that the second beating occurred or that the victim was alive when it took place.

Two expert witnesses for the prosecution (Dr. Hunter and criminalist Springer) testified that Willis Jones was probably beaten at two different locations in his bedroom, and defendant's expert, Dr. Root, testified that in most respects he agreed with Springer's testimony. But there was less evidence that Jones was alive at the time of the second beating. Springer did not express a view on this question, and Dr. Hunter based his conclusion that Jones was alive on the presence of clotted blood at the scene of the second beating, a theory that, the prosecutor acknowledged out of court, was "dubious." (See pt. II.C.2., *post.*)

We need not, however, determine whether the evidence was sufficient to support the prosecutor's two-beating theory. Both this court and the United States Supreme Court have held that when a prosecutor argues two theories to the jury, one of which is factually sufficient and one of which is not, the conviction need not be reversed, because the reviewing court must assume that the jury based its conviction on the theory supported by the evidence. (*Griffin v. United States* (1991) 502 U.S. 46 [112 S.Ct. 466, 116 L.Ed.2d 371]; *People v. Guiton* (1993) 4 Cal.4th 1116 [17 Cal.Rptr.2d 365, 847 P.2d 45].) Here, there was ample evidence to support the prosecutor's *second* theory—mentioned at the outset of this discussion—that defendant entered the house with the intent to steal from Jones, and that he killed Jones to accomplish this purpose. Defendant wore a mask, rifled through Jones's wallet, ransacked his house, and stacked his property next to the front door. This evidence was sufficient to support the jury's findings that defendant killed Jones in the course of a burglary and a robbery.

Defendant asserts the prosecutor "withdrew" this theory from the jury in closing argument by conceding that the jury could reasonably conclude defendant did not intend to steal when he entered the house. Not so. The prosecutor said the possibility that defendant initially lacked the intent to steal was "not the most persuasive interpretation of [what happened] but nevertheless an interpretation that *may* be reasonable." (Italics added.) In context the prosecutor, fearing the jury might reject his theory that defendant intended to steal when he arrived at Jones's house, argued that even if the jury found it "reasonable" that defendant lacked the intent to steal at that time, it should nevertheless convict him of capital murder. Contrary to defendant's argument, the prosecutor never conceded that defendant did not intend to steal when he entered Jones's house.

Defendant also contends the *Griffin-Guiton* rule, described above, is inapplicable here because the prosecutor withheld evidence that the two-beating theory was "dubious." As we shall explain (see pt. II.C.2., *post*), the prosecution withheld no such evidence.

■ Next, defendant asserts the two-beating theory was legally insufficient to establish that the killing occurred in the course of a *burglary*. He is correct: Although the intent to commit any felony or theft, including the intent to unlawfully kill or to commit felonious assault, would support a burglary conviction, the felony-murder rule and the burglary-murder special circumstance do not apply to a burglary committed for the sole purpose of assaulting or killing the homicide victim. (*People v. Garrison* (1989) 47 Cal.3d 746, 788-789 [254 Cal.Rptr. 257, 765 P.2d 419]; *People v. Wilson* (1969) 1 Cal.3d 431, 442 [82 Cal.Rptr. 494, 462 P.2d 22].) But the trial court correctly instructed the jury: "[I]f you enter a building to murder someone, that's burglary, but it doesn't count in this case. It's only a felony murder based on burglary if the entry was with the intent to steal. [¶] *If at the time of entry into Willis Jones' residence the defendant had either the intent to assault or even the intent to kill but not the intent to steal, then the defendant may not be convicted of first-degree felony murder based on burglary as the underlying felony.*" (Italics added.) As a result, the jury could not have been misled by the prosecutor's assertion—which he mentioned only on one occasion in closing argument—that the jury could use the two-beating theory as a basis for finding that the killing occurred in the course of a burglary. (See *People v. Sanchez* (1995) 12 Cal.4th 1, 70 [47 Cal.Rptr.2d 843, 906 P.2d 1129] ["[W]e presume the jury treated the court's instructions as statements of law, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade."].)

Defendant argues that the evidence at the preliminary hearing was insufficient to support the order holding him to answer for murder with burglary and robbery special circumstances. Even if this were true, he would not be entitled to reversal of the judgment because he has not shown prejudice. (*People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 529 [165 Cal.Rptr. 851, 612 P.2d 941].) Moreover, the evidence that defendant killed Jones, ransacked his house, and stacked his property next to the door amply supported the order holding defendant to answer for murder with special circumstances.

2. *Prosecutor's alleged reliance on false evidence and failure to disclose evidence impeaching Dr. Hunter*

■ As previously mentioned, Dr. Hunter, a pathologist, testified for the prosecution at the guilt phase of trial. During the jury's penalty phase deliberations, two newspaper articles were published that stated the Riverside County District Attorney's office had lodged a complaint with the Riverside County Coroner's Office about the quality of Dr. Hunter's work and testimony. After the jury had returned its penalty phase verdict, the district attorney's office gave defendant three internal memoranda critical of

Dr. Hunter. The memoranda, which were written after the jury returned its guilt phase verdict but before the penalty phase began, were authored by three deputy district attorneys and were addressed to Chief Deputy District Attorney Donald Inskeep.

One of the memoranda was by the prosecutor in defendant's case. It assessed Dr. Hunter's testimony regarding blood clotting in this case as follows: "Dr. Hunter testified that 'generally' blood flowing from a dead person does not clot. This was subject to a few exceptions, none of which applied to our facts. I consider this opinion dubious. My questions on blood clotting may have been answered by the defense when they called Dr. Irving Root. Dr. Root testified that blood flowing from a dead person definitely will clot." The prosecutor also complained that Dr. Hunter had not obtained or read his autopsy notes before testifying; that he had testified that certain wounds were "incisions" (that is, made by a sharp object like a knife), whereas his notes said they were "lacerations" (made by a dull object, such as the claw end of a hammer); and that he was "sloppy in procedure and careless in the preparation of reports." The other two memoranda, written by different prosecutors, criticized Dr. Hunter's performance on the witness stand in three other homicide cases.

First, defendant contends the prosecutor committed misconduct by relying on Dr. Hunter's testimony when the prosecutor knew or should have known the testimony was false and misleading. He points out that not only did the prosecutor present testimony which his memorandum later described as "dubious," but he relied on it in his closing argument to the jury.

Under well-established principles of due process, the prosecution cannot present evidence it knows is false and must correct any falsity of which it is aware in the evidence it presents, even if the false evidence was not intentionally submitted. (*Giles v. Maryland* (1967) 386 U.S. 66 [87 S.Ct. 793, 17 L.Ed.2d 737]; *Napue v. Illinois* (1959) 360 U.S. 264 [79 S.Ct. 1173, 3 L.Ed.2d 1217]; *People v. Sakarias* (2000) 22 Cal.4th 596, 633 [94 Cal.Rptr.2d 17, 995 P.2d 152].) Here, there is no evidence that the prosecutor had any doubts about the accuracy of Dr. Hunter's testimony when Dr. Hunter testified. Rather, Dr. Root's rebuttal testimony apparently led the prosecutor to question whether Dr. Hunter was correct when he testified that blood flowing out of a body after death does not clot.

Although prosecutors may have some experience with an expert's subject area, they are ordinarily ill equipped to determine the validity of a scientific theory or the correctness of its application to a particular case. Scientific theories on which technical experts base their opinions must be generally

accepted within the relevant scientific community to be admissible as evidence at trial, but general scientific acceptance of a theory is no guarantee of its accuracy. Moreover, even scientists who agree on a theory can disagree strongly on the correct application of that theory to the facts of a particular case. To sift truth from error in expert testimony, we must rely on the ordinary tools of cross-examination and rebuttal, the jury's power of analysis and evidence-weighing, and the court's power to exclude scientific theories not accepted by the relevant scientific community.

When, as here, the testimony of an expert witness for the defense causes the prosecutor to question the validity of testimony by the prosecutor's own expert, the prosecutor is not obligated to reveal those doubts to the jury. So long as the prosecutor's doubts are *based solely on the evidence presented at trial*, the jury is capable of deciding which of the competing experts is the more convincing, and the prosecutor's views have no bearing on that decision. Here, there is no evidence that the prosecutor's doubts as to the validity of Dr. Hunter's testimony were based on anything other than the testimony of Dr. Root, the expert witness for the defense. Thus, the prosecutor was entitled to rely on Dr. Hunter, notwithstanding his internal doubts as to which of the two experts was correct.

Defendant contends the three memoranda criticizing Dr. Hunter's testimony in this and his other cases were "exculpatory evidence" the prosecution was required to disclose. Due process requires the prosecution to disclose exculpatory evidence that is material to the defendant's guilt or innocence, or to punishment. (*Kyles v. Whitley* (1995) 514 U.S. 419, 438 [115 S.Ct. 1555, 1567-1568, 131 L.Ed.2d 490]; *In re Sassounian* (1995) 9 Cal.4th 535, 543-544 [37 Cal.Rptr.2d 446, 887 P.2d 527].) This duty includes disclosure of material evidence impeaching prosecution witnesses. (*Kyles v. Whitley, supra*, 514 U.S. 419, 433 [115 S.Ct. 1555, 1565]; *In re Sassounian, supra*, 9 Cal.4th 535, 544.) Exculpatory evidence is material if it creates a reasonable probability that the outcome of the trial would have been different had the evidence been disclosed. (*In re Sassounian, supra*, 9 Cal.4th 535, 544.)

We first consider the two memoranda written by prosecutors describing Dr. Hunter's testimony in cases *other than this one*. In these memoranda the prosecutors complained about discrepancies between what Dr. Hunter observed and recorded during autopsies and what he later testified to in court. These complaints are not pertinent here. Defendant does not dispute that Dr. Hunter accurately described his observation of clotted blood around the murder victim. Instead, defendant contends Dr. Hunter gave an erroneous theoretical explanation (blood does not clot after death and therefore the

victim was alive when bleeding) for a fact (the blood was clotted) whose existence was undisputed. The information in the prosecutors' memoranda would have shown Dr. Hunter to the jury as a careless and ill-prepared witness *when testifying to his recollection of factual observations he had made earlier*. Here, defendant does not object to Dr. Hunter's factual testimony, but to the conclusions Dr. Hunter drew from those facts. Even assuming that the prosecutors' opinions of Dr. Hunter as a witness would have been admissible (see Evid. Code, §§ 780, 786, 787), their portrayal, although unflattering, would have done little to impeach his scientific explanation of the causes of the clotted blood. Accordingly, the information in the prosecutors' memoranda was not material evidence because there is no reasonable probability that it would have led the jury to reject Dr. Hunter's expert opinion and, on that basis, to acquit defendant of first degree murder or to reject the robbery-murder and burglary-murder special circumstances.

The prosecutor's memorandum expressing his doubts as to Dr. Hunter's testimony on blood clotting *in this case* presents a different issue. This memorandum was significant only in that it described the prosecutor's personal doubts about the theory expounded by his expert witness. But such doubts are not a form of impeaching evidence that must be disclosed. As a general matter, a layperson's assessment of the persuasiveness of an expert's opinion is not relevant or admissible. More specifically, every lawyer presenting a case at trial makes an internal assessment of the strengths and weaknesses of the witnesses as the trial proceeds. Such assessments need not be revealed to the opposing party.

If the prosecution becomes aware of information that casts doubt on the accuracy of the testimony of one of its expert witnesses, it must disclose that evidence if it is material. Here, however, there is nothing to suggest that, before trial, the prosecutor was aware of any such information. Rather, the prosecutor's doubts about the accuracy of Dr. Hunter's testimony were apparently based on the trial testimony of a defense witness, Dr. Root. Both defendant and the jury, of course, learned of this evidence at the same time as the prosecutor, when Dr. Root testified.

Notwithstanding the lack of any duty to disclose their internal doubts regarding the accuracy of expert testimony when those doubts arise during trial, prosecutors remain under the solemn obligation to present evidence only if it advances rather than impedes the search for truth and justice. Ordinarily, attorneys "may ethically present evidence that they suspect, but do not personally know, is false." (*People v. Riel* (2000) 22 Cal.4th 1153, 1217 [96 Cal.Rptr.2d 1, 998 P.2d 969].) But the prosecutor is " 'the representative . . . of a sovereignty . . . whose interest . . . in a criminal

prosecution is not that it shall win a case, but that justice shall be done' " (*Kyles v. Whitley, supra,* 514 U.S. 419, 439 [115 S.Ct. 1555, 1568]), and the prosecutor may not become the "architect of a proceeding that does not comport with [the] standards of justice." (*Brady v. Maryland* (1963) 373 U.S. 83, 88 [83 S.Ct. 1194, 1197, 10 L.Ed.2d 215]). A prosecutor who, before trial, seriously doubts the accuracy of an expert witness's testimony should not present that evidence to a jury, especially in a capital case. But here we have no reason to believe that the prosecutor had any such doubts at the outset of trial.

Accordingly, we conclude the prosecution was not required to disclose the information in the prosecutors' memoranda criticizing Dr. Hunter, and the prosecutor could present Dr. Hunter's testimony on blood clotting and advocate the truth of that testimony to the jury notwithstanding his doubts.

### 3. *Placing nonrecord facts before the jury*

■ As previously mentioned, defendant called pathologist Irving Root, who disagreed with the testimony of Dr. Hunter, the prosecution's pathologist, that murder victim Willis Jones had been beaten in two locations and was alive during both beatings. Dr. Root's conclusions were based in part on his evaluation of photographs of blood splatters in the room where Jones was killed.

In his cross-examination of Dr. Root, the prosecutor asked a series of questions about Dr. Root's testimony in another case earlier that year. The prosecutor said the case was *"People v. Hallinski"* and "Eric Nakata" had been the prosecutor. The prosecutor asked whether, in that case, Dr. Root had declined to interpret blood splatter evidence and had testified he did not consider himself an expert in that field. Dr. Root could not recall his testimony, but he testified that before the trial in that earlier case he had spent several hours discussing blood patterns with the defense and the prosecution.

Defendant contends the prosecutor's cross-examination was misconduct, because the prosecutor asked questions that implied "facts" harmful to the defense, without a good faith belief that those facts were true. In support of this claim, he attempts to rely on a transcript of Dr. Root's testimony in a case entitled *People v. Halminski,* in which the prosecutor was Erik Nakata. But the transcript on which he relies is not part of the record in this case. Moreover, the record does not disclose the basis for the prosecutor's belief that Dr. Root had declined to interpret blood splatter evidence and had testified that he was not an expert on such matters. Finally, defendant did not

object to the prosecutor's questions. As a result, this claim may be raised only on habeas corpus, not on appeal. (See *People v. Carrera* (1989) 49 Cal.3d 291, 317, fn. 18 [261 Cal.Rptr. 348, 777 P.2d 121].)

Defendant further contends the prosecutor misstated Dr. Root's testimony in closing argument by twice stating that Dr. Root testified he had read no books on the subject of blood splatters, although Dr. Root actually testified that he had read some textbooks on the subject. Defendant's failure to object to the prosecutor's argument bars him from raising the issue on appeal. (*People v. Price* (1991) 1 Cal.4th 324, 447 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

### 4. *Shackling*

 Over defendant's objection, the trial court ordered defendant to wear leg restraints during trial. The court gave him a choice of a leg brace that would be worn inside his pants or an ankle cuff with a small chain, which was less cumbersome and more comfortable but was more likely to be visible to the jury. Defendant chose the ankle cuff. He now contends there was no showing of manifest necessity to justify the use of any restraints, and the court's order therefore violated not only the federal Constitution and state decisional law, but also section 688, which reads: "No person charged with a public offense may be subjected, before conviction, to any more restraint than is necessary for his detention to answer the charge."

 In *People v. Duran* (1976) 16 Cal.3d 282, 291 [127 Cal.Rptr. 618, 545 P.2d 1322, 90 A.L.R.3d 1], we held that a defendant may be physically restrained at trial only if there is a "manifest need for such restraints." (See also *Holbrook v. Flynn* (1986) 475 U.S. 560, 568-569 [106 S.Ct. 1340, 1346, 89 L.Ed.2d 525] ["shackling[] should be permitted only where justified by an essential state interest specific to each trial"].) "Such a ' "[m]anifest need" arises only upon a showing of unruliness, an announced intention to escape, or "[e]vidence of any nonconforming conduct or planned nonconforming conduct which disrupts or would disrupt the judicial process if unrestrained . . . ." ' [Citation.] 'Moreover, "[t]he showing of nonconforming behavior . . . must appear as a matter of record . . . . The imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other nonconforming conduct will be deemed to constitute an abuse of discretion." ' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 841 [72 Cal.Rptr.2d 656, 952 P.2d 673].) The trial court may not delegate to law enforcement personnel the decision whether to shackle a defendant. (*Ibid.*)

 Here, the record fails to establish any " ' "violence or a threat of violence or other nonconforming conduct" ' " (*People v. Hill, supra*, 17

Cal.4th 800, 841). The impetus for restraining defendant apparently originated with the sheriff's department. In the words of the trial court: "They [i.e., the sheriff's department] don't want him wholly unrestrained. They want something, even while we are in trial." The court added: "[T]he idea of a case like this, with no restraint at all and the door just a few feet away was a little too much for them, and it may be too much for me."

After trial, the court, elaborating on its reasons for restraining defendant, relied on the nature of defendant's crime (a violent murder) and the architecture of the courthouse (the courtroom door was apparently less than 40 feet from the public entrance to the courthouse). The circumstance that defendant was charged with a violent crime, however, does not establish a sufficient threat of violence or disruption to justify physical restraints during trial. (*People v. Hawkins* (1995) 10 Cal.4th 920, 944 [42 Cal.Rptr.2d 636, 897 P.2d 574]; *People v. Duran, supra,* 16 Cal.3d 282, 290-291.) Nor does the courthouse layout establish any individualized suspicion that defendant would engage in nonconforming conduct. Accordingly, the trial court abused its discretion in ordering defendant physically restrained during trial.

At a posttrial hearing on this issue, the trial court noted that "no record was made of what the jurors could actually see" of defendant's shackles, although in voir dire one prospective juror said she found it difficult to presume defendant innocent because "I believe he has some type of restraint on him." The trial court stated its belief that the jurors had not seen the shackles. By that time, however, the placement of the counsel tables in the courtroom had been changed significantly, and no attempt was made to recreate the trial layout to determine whether defendant's shackles would have been visible to the jurors.

Even assuming that the jury knew defendant was shackled, however, defendant cannot rely on that knowledge to show prejudice. As mentioned earlier, when given a choice, defendant opted for the ankle cuff instead of a leg brace that was to be worn inside his pants and thus was more easily concealed. In choosing the ankle cuff, defendant ran the risk of its visibility to the jurors, and he may therefore not now complain of prejudice arising from the jury's observation of the cuff. Moreover, defendant admitted to the brutal killing of Willis Jones, claiming he had acted in the heat of passion. Given this admission, an occasional glimpse of defendant in shackles would not have affected the jury's verdict. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 988-989 [108 Cal.Rptr.2d 291, 25 P.3d 519]; *People v. Tuilaepa* (1992) 4 Cal.4th 569, 584-585 [15 Cal.Rptr.2d 382, 842 P.2d 1142].)

Defendant contends that even if his shackling was not prejudicial at the guilt phase, his shackling at the penalty phase necessitates reversal of the

jury's verdict of death. He argues that a trial court's unjustified decision to shackle a defendant at the penalty phase of a capital trial requires reversal without an evaluation of prejudice, because it conveys a message of future dangerousness that renders the penalty phase unconstitutionally arbitrary and capricious under the Eighth Amendment to the federal Constitution. He relies on *Elledge v. Dugger* (11th Cir. 1987) 823 F.2d 1439, 1450-1452. There, by a narrow two-to-one majority, a federal appellate court rejected a case-by-case evaluation of prejudice and apparently adopted a reversal per se rule when a defendant's shackles, unjustifiably ordered by the trial court, are visible to the jury at the penalty phase of a capital trial. ▇▇▇ Decisions of the federal courts of appeal are not binding on this court. ▇▇▇ In any event, as discussed earlier, here any observations by the jury of defendant's shackles were attributable to his decision to wear an ankle cuff rather than a leg brace. Thus, reversal is not required.

### 5. *Exclusion of evidence bearing on intent to kill*

▇▇▇ The parties stipulated that a sample of defendant's blood, obtained at 7:20 on the morning after the killing, contained a blood-alcohol level of .03 percent. When cross-examined by the defense, criminalist Faye Springer estimated, based on this sample, that defendant's blood-alcohol level at the time of the killing would have been .13 to .14 percent. When defense counsel asked whether a person with that quantity of alcohol in the blood would have "impaired judgment," the prosecutor objected, and the parties discussed the matter with the judge in chambers. The prosecutor argued the question was irrelevant and beyond the scope of direct examination. Defense counsel said he would submit the matter and suggested as an alternative that he merely ask Springer how much beer a 185-pound man (defendant's approximate weight) would have to drink to reach a blood-alcohol level of .13 or .14. After hearing testimony from Springer in chambers, the trial court sustained the prosecutor's objection to the latter question. Thereafter, the trial court told the jury it had sustained the prosecutor's initial objection on the ground that defense counsel's question fell outside the scope of direct examination.

Later, during the testimony of defense witness Dr. Irving Root, the prosecutor moved to exclude testimony relating to defendant's level of intoxication at the time of the killing to the level of intoxication necessary to constitute driving under the influence of alcohol, which at that time was statutorily set at .10 percent. At a hearing outside the jury's presence, the trial court expanded the issue to cover whether Dr. Root could offer any relevant testimony about defendant's level of intoxication at the time of the killing.

At the hearing, Dr. Root testified that an individual with a blood-alcohol level of .13 would have impaired judgment and reduced inhibitions, but he could not say how great the impairment would be or predict how the individual would act in a given situation. When the trial court asked whether persons with that blood-alcohol level might be so affected that they would not form an intent to kill, Dr. Root replied: "I don't think one can go that far. I don't think one can make the statement at any level of alcohol that the given individual would or would not form the intent to kill." Asked to elaborate, he explained that the ability of such a person to form the intent to kill would be impaired, but not destroyed. The trial court then excluded Dr. Root's testimony under Evidence Code section 352, ruling the testimony would consume too much time and its probative value was "very slight compared to the possibility of confusing the jury."

Defense counsel then asked whether Dr. Root could testify about the effects of defendant's cocaine ingestion on his behavior. Still in chambers, Dr. Root stated that use of large quantities of cocaine tends to result in aggressive behavior, an effect more pronounced in persons who are also under the influence of alcohol. The court concluded that its ruling excluding Dr. Root's proposed testimony regarding the effects of alcohol intoxication should also apply to his proposed testimony pertaining to the effects of cocaine and the joint effects of alcohol and cocaine.

Defendant contends the trial court erred in sustaining the prosecutor's objection when defendant asked criminalist Springer if the judgment of a person with a blood-alcohol level of .13 or .14 percent would be impaired. Defendant asserts that although the court ostensibly sustained the objection on the ground that the testimony was beyond the scope of the prosecutor's direct examination, its *"real* reason" for sustaining the objection was its belief that the evidence was irrelevant. We accept the trial court's explanation for its ruling: The question was beyond the scope of direct examination. Defendant does not argue that this basis for sustaining the prosecutor's objection was unsound.

Defendant also faults the trial court for excluding Dr. Root's proposed testimony pertaining to the effects of alcohol, cocaine, and a combination of the two. He argues the evidence was relevant on the issue of intent to kill. Intent to kill was an element of the charge of first degree murder under the theory that the killing was premeditated, but not under the theory that the killing occurred in the course of a burglary or robbery; it was also an element of the special circumstance allegations.

We find no error. Defendant testified that he was not drunk when he went to Jones's house. Moreover, Dr. Root's proposes testimony that ingestion of

the amount of alcohol allegedly consumed by defendant would impair but not destroy the ability to form an intent to kill contained little if any information a layperson would not know, and Dr. Root's proposed testimony that the combined use of cocaine and alcohol may cause aggressive behavior shed little light on whether defendant intended to kill Jones. Under these circumstances, the trial court did not abuse its discretion when it excluded the testimony under Evidence Code section 352.

### 6. *Admission of photographs*

██ At the beginning of trial, the prosecution showed witness Edith Hayes a photograph that showed victim Willis Jones while alive. At the close of the prosecution's case, the prosecutor did not offer the photograph into evidence, but he moved it into evidence after defense counsel showed the photograph to witness Thelma Garrett. Defendant did not object, and the trial court admitted the photograph. Defendant argues the photograph was irrelevant and therefore should not have been admitted. He has not preserved the right to raise this contention on appeal, because he did not object to admission of the photograph at trial. (Evid. Code, § 353, subd. (a).)

Defendant also contends the trial court erred in admitting certain autopsy photographs of the victim, Willis Jones. These photographs were admitted because they were relevant to the prosecutor's two-beating theory (see pt. II.C.1., *ante*). Defendant argues that because that theory was "subsequently discredited," the photographs should not have been admitted. Whether or not the theory was discredited, the photographs were "relevant in establishing the fact that a murder had occurred." (*People v. Scheid* (1997) 16 Cal.4th 1, 15 [65 Cal.Rptr.2d 348, 939 P.2d 748].) The trial court did not abuse its " 'broad discretion' " (*id.* at p. 18) when it concluded that the probative value of the photographs outweighed their prejudicial effect.

### 7. *Admission of defendant's statement to police*

██ After his arrest but before receiving the warnings against self-incrimination required by *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974], defendant made a brief statement in which he said he had been asleep for the previous hour and one-half, he had just gotten out of jail, and he had not had sexual relations since his release. The prosecution sought to introduce this statement during its cross-examination of defendant. Defendant objected, claiming the statement was irrelevant, but the trial court ruled the statement was relevant to defendant's credibility.

On appeal, defendant contends the trial court should have excluded the statement because it was obtained in violation of *Miranda*. Because defendant did not object on this ground in the trial court, he may not now raise this issue. (*People v. Mattson* (1990) 50 Cal.3d 826, 853-854 [268 Cal.Rptr. 802, 789 P.2d 983].) Defendant's contention that the court should have instructed the jury that statements obtained in violation of *Miranda* may be considered only for impeachment also fails, because the court made no finding that the statement was obtained in violation of *Miranda*.

Defendant contends the trial court should have sustained his objection on the ground of relevance. Not so. His false account of his actions at the time of the killing was relevant to whether his trial testimony about those actions was truthful. Defendant asserts that certain truthful portions of the statement (his explanation that he had just been released from jail and had not recently had sexual relations) were irrelevant and prejudicial and should not have been admitted. Defendant failed to object on this ground in the trial court and thus may not do so here. (*People v. Mattson, supra*, 50 Cal.3d 826, 853-854.)

8. *Failure to preserve and test evidence*

 Defendant claims the prosecution violated his right to due process in three respects: (1) It failed to measure the blood splatter pattern that was the subject of criminalist Springer's testimony, which could have been helpful in determining whether the splatter came from hammer blows to the victim's head or from the victim's falling off the bed; (2) it failed to test the clotted blood on the floor for the presence of fibrinogen, which could have disproved Dr. Hunter's theory that the victim was alive when the bleeding occurred; (3) it failed to promptly test the blood found on a knife at the scene of the crime, so that by the time the blood was tested it could not be determined whether the blood was the victim's, or even human. Defendant's failure to raise these objections at trial bars him from doing so on appeal. (*People v. Beeler* (1995) 9 Cal.4th 953, 975 [39 Cal.Rptr.2d 607, 891 P.2d 153].) In any event, his claims lack merit.

None of this evidence on its face was favorable to the defense: Depending on their results, the unperformed tests and measurements could have tended to either exculpate or further incriminate defendant. "[T]he police do not have a constitutional duty to perform any particular tests." (*Arizona v. Youngblood* (1988) 488 U.S. 51, 59 [109 S.Ct. 333, 338, 102 L.Ed.2d 281].) When the state fails to preserve evidence "of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant," there is no due process violation unless the

defendant can show the state destroyed the evidence in bad faith to prevent the defendant from using it for exculpatory purposes. (*Id.* at pp. 57-58 [109 S.Ct. at pp. 337-338].)

Here, defendant has not shown that the police believed the evidence they failed to preserve or the tests they failed to perform would have exculpated defendant, or that their purpose was to deny him the opportunity to use the evidence to exculpate himself.

### 9. *Refusal to postpone defendant's testimony*

During trial, defendant was given several medications, some of which caused drowsiness and other side effects. On one occasion, November 22, 1988, his drowsiness was so severe that trial was postponed and he was taken to the hospital for a checkup. As a result, defendant's medication schedule was changed, and he was given his medications in the evening rather than in the morning.

Defendant appeared at trial the day after he was taken to the hospital, which was the day the defense was to begin presenting its case and the last day before the Thanksgiving break. At the start of the day, defense counsel said defendant was still light-headed and he preferred defendant not to testify in that condition. Later that day, after other defense witnesses had testified, defense counsel asked the court to postpone defendant's testimony. Stating it had not observed any impairment of defendant, the trial court insisted that defendant begin his testimony that day. Defendant testified for about 45 minutes until proceedings were adjourned. Defendant completed his testimony eight days later, after the Thanksgiving recess and the intervening testimony of defense expert Dr. Root, at a time when he did not complain of any medication side effects.

Defendant contends the trial court violated his right to due process by insisting he begin testifying when he was still under the effects of his medication. (See *Riggins v. Nevada* (1992) 504 U.S. 127 [112 S.Ct. 1810, 118 L.Ed.2d 479].) He claims that the side effects of his medication caused him to appear emotionless, remorseless, and uncaring during his testimony, which led the prosecutor at the guilt phase and penalty phase closing arguments to describe him as "cold as ice" while testifying, and the "ice man" who "doesn't give a damn about the victims" and "shows no emotion."

Defendant has not shown that the trial court erred when it found his medication did not impair his ability to testify. The trial court had observed defendant throughout the day and had not noticed any drowsiness or other

symptoms. Nor does the content of defendant's testimony, when compared to his testimony eight days later, suggest he was confused or mentally impaired.

Moreover, on the day defendant was allegedly affected by his medication, his account reached only the point when he argued with his girlfriend, Thelma Garrett, after finding her standing nude between the victim's legs. He gave the most critical part of his testimony—about his later return to the victim's house and his killing of the victim—eight days later, at a time when there is no evidence he was impaired. This later testimony gave the jury ample opportunity to observe defendant's demeanor when he was unaffected by medication, and to judge his attitudes toward the victim and his crime.

### 10. *Admission of rebuttal testimony*

After the defense had rested, the prosecution called Police Sergeant Ronald Mackey to testify in rebuttal regarding his interview with Thelma Garrett, defendant's girlfriend, on the morning after the murder. In the interview, Garrett made several statements that were inconsistent with her testimony on defendant's behalf. The interview was tape-recorded, and Mackey listened to the recording and reviewed a transcript of the interview before testifying. He had the transcript in front of him while he testified, and at times he quoted from it when recounting her statements to him.

Defendant asserts the trial court should not have permitted this testimony for four reasons. (1) The transcript was "riddled with 'unintelligible' statements," and Sergeant Mackey's testimony "was often his interpretation of what Garrett had meant"; thus, the testimony "fails to provide the 'particularized guarantees of trustworthiness required' by the Confrontation Clause" and cannot satisfy "the heightened standard of reliability imposed by the Eighth Amendment." (2) Garrett's interview statements were hearsay, and were not admissible as prior inconsistent statements because they were generally consistent with her trial testimony. (3) The tape recording and the transcript were never authenticated. (4) The testimony was "unreliable, untrustworthy and inadmissible, at least on Evidence Code section 352 grounds." Defendant objected on none of these grounds at trial, and therefore he has not preserved the right to raise them on appeal. (Evid. Code, § 353, subd. (a).)

There was no basis for objection on any of the four grounds mentioned above. (1) Sergeant Mackey could have recounted Garrett's statement to him even if the tape recording and transcript were unavailable, and the accuracy of his testimony was greatly enhanced because he refreshed his recollection

by reviewing them. Thus, any inadequacies in the recording and transcript had no bearing on the admissibility of his testimony. (2) Garrett's statement to Mackey differed in several respects from her trial testimony. Most significantly, she told Mackey defendant knew she was a prostitute and she shared money gained from acts of prostitution with him. This contradicted her testimony at trial and refuted defendant's claim that he went to Willis Jones's house not to commit a burglary, but because he was upset after having seen Garrett, naked, standing between Jones's legs. (3) There was no need to authenticate the tape recording and transcript because they were not introduced into evidence, but were only used to refresh Sergeant Mackey's recollection. (4) There was no basis for excluding the testimony under Evidence Code section 352 because, as explained above, Mackey's description of Garrett's prior inconsistent statements was more reliable and accurate than most testimony regarding out-of-court statements, and its probative value outweighed any possible prejudicial effect.

11. *Permitting prosecutor to resurrect premeditated murder theory*

During the argument about the admissibility of Dr. Irving Root's testimony on intoxication and cocaine use (see pt. II.C.5., *ante*), defendant asserted the testimony was admissible on the question of whether he premeditated and deliberated the murder. The prosecutor claimed he was relying solely on the felony-murder rule to establish defendant's guilt of murder, and therefore "premeditation and deliberation is not an issue in this case." The trial court commented that abandonment of the premeditation and deliberation theory would leave the prosecutor with no basis for conviction if the jury found the killing did not occur in the course of a burglary or robbery, and suggested the prosecutor should retain the premeditation argument as a "fall-back position." The prosecutor responded: "Perhaps." When the case was submitted to the jury the trial court granted the prosecutor's request to instruct the jury on premeditation and deliberation.

Defendant contends the prosecutor abandoned the premeditation and deliberation theory as part of his successful effort to persuade the trial court to exclude Dr. Root's testimony, and the court violated his right to due process of law by thereafter permitting the prosecutor to resurrect that theory. It is unclear, however, whether the prosecutor actually abandoned the theory. Assuming for the sake of argument that the court should have ruled that the prosecution had waived the right to rely on a theory of premeditation and deliberation, the error was harmless: The jury found true the felony-murder special-circumstance allegations, thus demonstrating it would have convicted defendant of murder regardless of whether the case was submitted on a theory of premeditation and deliberation in addition to felony murder.

(*People v. Bacigalupo* (1991) 1 Cal.4th 103, 125 [2 Cal.Rptr.2d 335, 820 P.2d 559].)

### 12. *Denial of defense motion to continue closing argument*

Trial testimony concluded on Thursday, December 1, 1988, and the parties spent portions of the next three court days (December 2, 5, and 6) discussing instructions. At the end of those discussions, defense counsel sought a one-day continuance "so I can write this [closing] argument coherently since I now know what instructions will be given." The trial court denied his request, and closing argument began the next morning. Defendant argues the court abused its discretion when it denied the motion for continuance.

A motion for continuance should be granted only on a showing of good cause. (§ 1050, subd. (e).) The trial court has substantial discretion in ruling on midtrial motions to continue the case, and appellate challenges to a trial court's denial of such a motion are rarely successful. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. Beeler, supra,* 9 Cal.4th 953, 1003.) Here, testimony was completed five days before defendant sought a continuance, giving counsel ample time to prepare his closing argument. The trial court reasonably concluded that defense counsel could make any modifications to his argument necessitated by the court's rulings at the instruction conference before argument began the next morning. We find no abuse of discretion.

### D. *Prosecutorial Misconduct in Closing Argument*

Defendant argues the prosecutor committed repeated misconduct in his closing arguments to the jury. His failure to object to the alleged misconduct or to seek a jury admonition bars him from raising the issue on appeal. "To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct." (*People v. Price, supra,* 1 Cal.4th 324, 447.) According to defendant, any objections to the conduct at issue would have exacerbated the problem, and therefore we should excuse his failure to object. We disagree. As we explain below, the vast majority of the statements cited by defendant were unobjectionable. As to the remainder, a timely objection and admonition would have cured the harm.

### 1. *Relying on theory the prosecutor disbelieved; misstating the law*

In his closing argument, the prosecutor told the jury that even if it decided that defendant "went over to . . . [Willis] Jones' place to kill him, you could

still find . . . based on two attacks, still find that the death was in the course of a burglary or robbery." He explained that if defendant went to the house intending to kill Jones, and formed the intent to steal between the two beatings of Jones, the killing "is a death that occurs in the course of a robbery." Defendant argues this argument misstated the law. He is only partially right.

As we have previously explained (see pt. II.C.1.d., *ante*), we agree with defendant that the prosecutor misstated the law with regard to *burglary*. But the trial court correctly instructed the jury: "[I]f you enter a building to murder someone, that's burglary, but it doesn't count in this case. It's only a felony murder based on burglary if the entry was with the intent to steal. [¶] *If at the time of entry into Willis Jones' residence the defendant had either the intent to assault or even the intent to kill but not the intent to steal, then the defendant may not be convicted of first-degree felony murder based on burglary as the underlying felony.*" (Italics added.) Moreover, the primary thrust of the prosecutor's argument was that defendant would be guilty of *robbery*, not *burglary*, if he formed the intent to steal between the beatings. In this respect, the prosecutor's argument was legally sound. As a result, the prosecutor's misstatement of the law was harmless. (See *People v. Sanchez, supra*, 12 Cal.4th 1, 70.)

Defendant also contends the prosecutor committed misconduct in closing argument by propounding Dr. Hunter's theory that the clotted blood at the site of the alleged second beating showed that Jones was still alive when that beating occurred, even though the prosecutor shortly thereafter sent a memorandum to a superior expressing his belief that Hunter's theory was "dubious." As explained earlier (see pt. II.C.2., *ante*), the prosecutor could argue Dr. Hunter's theory to the jury notwithstanding his private doubts about that theory.

### 2. *Verbal attacks on Dr. Root*

In his closing argument, the prosecutor used harsh language to attack Dr. Root, the pathologist who testified for the defense. He claimed Dr. Root had given the jury "an opinion on an area that he doesn't have a clue about," that Root "has as much experience in blood splatters as he does in [building] bridges," that Root's testimony was "probably the most pathetic attempt that I have seen for someone to try to explain what they mean," that Root was "not qualified as any sort of an expert in blood splatters," and that Root's testimony was "bunk." He admitted that in his cross-examination of Root he had been sarcastic, explaining: "I get very impatient with incompetence." He repeatedly called Root "Half-truth Root," until defendant objected and the trial court asked him not to repeat the characterization.

Defendant maintains these comments were inappropriate because they expressed a personal belief that Dr. Root was unqualified, based on information of which the jury was unaware. The prosecutor's comments, however, were based entirely on the evidence presented at trial.

Pointing to a photograph of the murder scene, the prosecutor argued that the jury could tell there were two beatings from looking at the photograph, and he described the contrary view as "stupid." Defendant claims this argument injected the prosecutor's personal views and misstated the evidence, because criminalist Springer, a prosecution witness, testified that the bloodstains in the photograph could have occurred in one splash. But the photograph on which the prosecutor based his argument had been introduced at trial as an exhibit, and he was entitled to ask the jurors to look at it and draw their own conclusions.

The prosecutor asserted that his own expert witnesses, Dr. Hunter and criminalist Springer, were more credible than Dr. Root because, unlike Dr. Root, they were not "guessing from photographs." According to defendant, these comments were misconduct because the prosecution experts' testimony about blood splatters was based on the same photographs that Dr. Root relied on. But Dr. Hunter had performed the autopsy of Willis Jones, and criminalist Springer had been to the murder scene, and their observations may have assisted them in drawing their conclusions. The prosecutor's statement was fair comment on the evidence.

### 3. Misstating testimony

In his closing argument, the prosecutor said Robert Pead testified that when he went to murder victim Jones's house, Jones "may have been alive," and that Jones was "making some sound, as I recall." Defendant faults the prosecutor for misstating the evidence, pointing out that Pead did not testify that Jones had made any sound, and that he said Jones was not breathing when he found him. This minor and inadvertent misstatement of the evidence, which the prosecutor qualified with the words "as I recall," could not have affected the outcome of the trial. The jury no doubt detected the inaccuracy, because during its deliberations it asked that Pead's testimony be reread, but said it had heard enough shortly after the reporter read the testimony that Jones was not breathing when Pead found him.

Defendant contends the prosecutor misstated the evidence when he said Mitchell Hayes testified he heard a "struggle" in Jones's house. Hayes actually said he heard a "bunch of scuffling," which is not significantly different from the prosecutor's statement. Defendant also claims that the

prosecutor misstated the evidence when he argued there was a four-hour gap between the time Thelma Garrett was at Jones's house and the time of the killing. Garrett's testimony, however, supported the prosecutor's argument.

### 4. *Verbal attacks on defense counsel*

In his arguments to the jury, the prosecutor described the defense case as "ludicrous," "contrived," "concocted," and "bogus." Defendant asserts these descriptions were improper because they were "personal attacks on the integrity of opposing counsel." (*People v. Espinoza* (1992) 3 Cal.4th 806, 820 [12 Cal.Rptr.2d 682, 838 P.2d 204].) Having reviewed the remarks in their proper context, we disagree. The remarks were comments on the evidence presented by the defense and did not impugn counsel's integrity.

Defendant also argues the prosecutor committed misconduct when he complained that defense counsel repeatedly used the phrase "I believe" in his closing statement to the jury. The prosecutor described this as "unethical" and explained, "you use 'I' when perhaps your client or your case has no credibility but perhaps you do." Although we agree with defendant that the prosecutor should not have described defense counsel's tactic as unethical, the prosecutor's underlying point—that the jury should base its verdict on the evidence, not counsel's personal beliefs—was valid. It is inconceivable that the prosecutor's passing comment that defense counsel engaged in an unethical tactic could have affected the trial's outcome.

### 5. *Implying a belief in defendant's guilt*

Defendant argues the prosecutor expressed a personal belief in defendant's guilt when he told the jurors that the only just verdict was to convict defendant of special circumstances murder, because it is "the only right thing to do in this case" and because "[h]e did it." These statements were fair commentary on the evidence presented.

### 6. *Cumulative error*

Defendant contends the prosecutorial misconduct complained of, combined with the prosecutor's alleged misconduct in presenting the two-beating theory (see pts. II.C.1.a., II.C.2., II.C.3., *ante*), constituted a pattern of misconduct so pervasive that it infected the integrity of the proceedings, thus requiring reversal regardless of whether the acts affected the outcome of the trial. As explained above, we find no pervasive pattern of misconduct that would warrant reversal.

E. *Instructional Errors*

1. *Pinpoint instructions refused by trial court*

 Defendant contends the trial court should not have rejected his instruction stating: "The intent to rob or steal formed after the infliction of mortal wounds is not sufficient to support a finding of first degree felony murder." We disagree. This point of law was adequately covered by another special instruction the defense had requested, explaining that there was no robbery if defendant's intent to steal arose only after he killed the victim. In addition, the trial court's instructions on specific intent and on felony murder, which were derived from two standard instructions, CALJIC Nos. 3.31 and 8.21, told the jury that the specific intent to rob must coexist with the act of killing before robbery could be used as a basis for felony murder. (See *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1250 [74 Cal.Rptr.2d 212, 954 P.2d 475].) Thus, the trial court did not err in rejecting defendant's proposed instruction.

 Defendant also complains that the trial court erred when it rejected his proposed instruction defining "heat of passion" as follows: "The phrase 'heat of passion' as used in these instructions need not be limited to rage or anger but may be any violent, intense, high-wrought or enthusiastic emotion." The trial court's instructions describing heat of passion, based on CALJIC Nos. 8.42 and 8.44, were adequate to define the phrase, and it is not reasonably probable that the jury's verdict would have been different if the trial court had elaborated on that definition in the manner requested by defendant.

2. *Instruction on voluntary manslaughter*

 The trial court denied defendant's request that it instruct the jury there is no malice aforethought but only manslaughter if defendant killed in unreasonable self-defense, that is, in the "honest but unreasonable belief in the necessity to defend oneself against imminent peril to life or great bodily injury." The court found no evidence to support the proposed instruction. In claiming the contrary, defendant points to his testimony that after he struck the victim with his fist, the victim wielded a hammer, which defendant then wrested from the victim and used to attack the victim. He asserts he attacked the victim with the hammer in an effort to protect himself. Because, however, defendant's testimony showed him to be the initial aggressor and the victim's response legally justified, defendant could not rely on unreasonable self-defense as a ground for voluntary manslaughter. (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1 [30 Cal.Rptr.2d 33, 872 P.2d 574].)

Furthermore, under the felony-murder rule, a killing in the commission of certain felonies specified in section 189 is first degree murder, not manslaughter, even if the killer acts in unreasonable self-defense. Here, the jury found true the special circumstance allegations that defendant killed the victim in the course of a burglary and a robbery, both of which are felonies enumerated in section 189. As a result, any conceivable error in refusing to instruct the jury on unreasonable self-defense was harmless. (*People v. Price, supra,* 1 Cal.4th 324, 464.)

### 3. *Trial court's failure to instruct further on the definition of a deadly and dangerous weapon*

Defendant was charged with a sentence enhancement under section 12022, subdivision (b), alleging he had used a deadly or dangerous weapon in killing the victim. Defendant contends the trial court's instructions on this enhancement inadequately defined "a deadly or dangerous weapon." He contends the trial court should on its own initiative have given CALJIC No. 12.42, which tells the jury that, in determining whether an object is a deadly or dangerous weapon, it is to consider "the circumstances attending any possession of the instrument or object by the defendant."

Here, the instructions adequately defined a deadly or dangerous weapon as "any weapon, instrument, or object that is capable of being used to inflict great bodily injury or death." Moreover, defendant admitted at trial that he killed the victim by striking him with the hammer. There was no dispute over whether the hammer was capable of deadly and dangerous use, or whether he had so used it.

Defendant also argues the trial court's failure to give an instruction patterned on CALJIC No. 12.42 prejudiced the jury's murder deliberations. That instruction, which is based on *People v. Grubb* (1965) 63 Cal.2d 614, 619-621 [47 Cal.Rptr. 772, 408 P.2d 100], guides a jury's determination of whether an object is a deadly weapon in cases when the object has not actually been used as a weapon. That was not the situation here. In an argument that lacks logical coherence, defendant contends such an instruction would have prompted the jury to conclude that the hammer was not a deadly weapon, that defendant did not bring it to the victim's house, that he lacked intent to kill or rob when he entered the house, and that he lacked intent to rob when he killed the victim. It is inconceivable that the jury would have found the hammer, the instrument of murder here, not to be a deadly weapon.

### 4. *Trial counsel's failure to propose certain instructions*

██ Defendant argues his trial counsel was ineffective because he did not ask the trial court to supplement certain of its instructions. To demonstrate ineffective assistance of counsel, a defendant must show that counsel's action was, objectively considered, both deficient under prevailing professional norms and prejudicial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [104 S.Ct. 2052, 2064, 80 L.Ed.2d 674].) To establish prejudice, a defendant must show a reasonable probability that, but for counsel's failings, the result of the proceeding would have been more favorable to the defendant. (*Id.* at p. 694 [104 S.Ct. at p. 2068].) As we explain below, we need not determine here whether counsel's actions were deficient, for defendant has failed to show prejudice.

The trial court instructed the jury that voluntary intoxication could negate the intents required for murder, voluntary manslaughter, robbery, and burglary. Defendant contends that his counsel should have asked the court to explain more precisely the effect of voluntary intoxication on the existence of the mental states at issue. But defendant's evidence of his intoxication did not strongly suggest that it prevented him from forming the intent to commit these crimes. It is not reasonably probable that further instructions would have altered the jury's conclusion that defendant's intoxication did not prevent him from forming the requisite intents.

Defendant argues that counsel should have asked the trial court to supplement its instructions on the issue of provocation to clarify that provocation may arise from a series of events. He claims that the jury may not have understood this point because the court's instructions, drawn from CALJIC Nos. 8.42 and 8.44, referred to only a single provocative event. The court's instructions, however, did not imply that provocation could *not* arise from a series of events. In addition, defense counsel argued defendant's provocation arose from a whole series of events on the day of the murder. It is not reasonably probable that further instructions regarding provocation would have altered the jury's conclusion that defendant's killing of the victim was first degree murder rather than manslaughter.

### 5. *Trial court's failure to instruct on involuntary manslaughter*

██ The trial court did not instruct the jury on involuntary manslaughter. Defense counsel and defendant each personally agreed to this decision, however. Defendant contends the trial court erred in not instructing the jury, on its own initiative, on involuntary manslaughter. He relies on the evidence of his intoxication, both the evidence that was admitted at trial and that

which the court excluded, erroneously in his view. He contends this evidence, if believed by the jury, was sufficient to show he lacked intent to kill because of his intoxication and was therefore guilty of only involuntary manslaughter.

We need not decide whether this evidence was sufficient to require the trial court to instruct on involuntary manslaughter, or whether the invited error doctrine bars defendant from challenging the trial court's failure to give the instruction, because any error was harmless. On direct examination, defendant was asked if he was affected by the alcohol or the cocaine when he left for Willis Jones's house on the night of the murder. He replied: "Yes, but I wasn't drunk." The evidence also showed that defendant hit Jones in the head with a hammer more than 40 times, which strongly suggests an intent to kill. Thus, it is not reasonably probable that defendant would have obtained a more favorable outcome had the jury been instructed on involuntary manslaughter. (See *People v. Breverman* (1998) 19 Cal.4th 142, 178 [77 Cal.Rptr.2d 870, 960 P.2d 1094].)

### 6. *Instructions on reasonable doubt*

Defendant launches a variety of attacks on the trial court's instructions pertaining to the requirement that the prosecution must establish the elements of the crimes charged beyond a reasonable doubt.

The trial court gave the standard instructions on weighing circumstantial evidence (CALJIC No. 2.01 (1979 rev.)) and evaluating circumstantial evidence of a defendant's mental state (CALJIC No. 2.02 (1980 rev.)). These instructions told the jury that if the circumstantial evidence of guilt or of defendant's mental state was susceptible of two reasonable interpretations, one pointing to guilt or the existence of the mental state, the other pointing to innocence or the absence of the mental state, it must adopt the interpretation favorable to defendant. The instructions also said that if one interpretation of the circumstantial evidence "appears . . . to be reasonable and the other interpretation to be unreasonable," the jury's "duty" was to accept the reasonable interpretation.

Defendant argues that, by telling jurors they had the "duty" to accept the only interpretation of the circumstantial evidence that "appears" to be reasonable, these instructions were inconsistent with the prosecution's obligation to prove guilt beyond a reasonable doubt, as required by the due process clause of the federal Constitution's Fourteenth Amendment. He further claims these instructions were unconstitutional because the word "duty" impermissibly created a mandatory, conclusive presumption of guilt. We

have rejected these contentions in the past. (See, e.g., *People v. Hines* (1997) 15 Cal.4th 997, 1050-1051 [64 Cal.Rptr.2d 594, 938 P.2d 388].) Moreover, defendant invited any conceivable error in giving these instructions because he asked the trial court to give them. (See *People v. Lucero, supra,* 23 Cal.4th 692, 723.)

In his closing argument to the jury, defense counsel relied on the circumstantial evidence instructions. He claimed there were two reasonable interpretations of the evidence: that defendant killed Willis Jones in the course of a burglary or robbery, or that he killed in a sudden quarrel or heat of passion. Since both were reasonable, defense counsel maintained, the circumstantial evidence instructions required the jury to accept the latter interpretation because it was favorable to defendant. In rebuttal, the prosecutor asserted there was only one reasonable interpretation of the evidence: that the killing occurred in the course of a burglary and a robbery. Defendant contends the combined effect of the circumstantial evidence instructions and the prosecutor's argument was to tell the jury it could convict defendant on a standard less than beyond a reasonable doubt. Having carefully reviewed the argument, we find nothing to suggest that the jury should apply an incorrect standard in determining defendant's guilt.

The trial court also gave the jury CALJIC No. 2.90, a standard instruction defining the phrase "reasonable doubt" as arising when a juror does not feel "an abiding conviction, *to a moral certainty,* of the truth of the charge." (Italics added.) Defendant points out the United States Supreme Court held, in *Victor v. Nebraska* (1994) 511 U.S. 1 [114 S.Ct. 1239, 127 L.Ed.2d 583], that the italicized phrase added nothing of value to the reasonable doubt instruction, and thereafter this court recommended that trial courts delete that phrase when instructing on reasonable doubt. (*People v. Freeman* (1994) 8 Cal.4th 450, 502-504 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888].) He contends the court's failure to delete the phrase "to a moral certainty" here, when combined with the circumstantial evidence instructions and the prosecutor's closing argument just discussed, caused the jury to misunderstand the reasonable doubt standard. We disagree. We have repeatedly held that a trial court's failure to delete the phrase "to a moral certainty" from the instruction on reasonable doubt is not error (see, e.g., *People v. Hines, supra,* 15 Cal.4th 997, 1051), and neither the court's circumstantial evidence instructions nor the prosecutor's closing argument require a different conclusion here.

Before instructing the jury, the trial court briefly described to the jury the various types of instructions that would be given, at one point saying, "And then there are some other procedural rules like reasonable doubt and things

like that . . . ." Defendant contends this comment may have misled jurors about the fundamental importance of the reasonable doubt standard in criminal cases. We disagree. Regardless of whether it is accurate to characterize the reasonable doubt standard as a procedural rule, this passing comment by the trial court could not have affected the jury's deliberations.

We also reject defendant's argument that the trial court's comments improperly directed the jury to choose between convicting him of murder or of manslaughter, without suggesting "not guilty" as an option. Although, if read in isolation, the comment might be read as omitting the option of a not guilty verdict, the trial court's instructions, when taken as a whole, made it clear that the jury could acquit defendant, and in discussing the verdict forms the court expressly told the jury it could return a not guilty verdict.

### 7. *Instructions on intent to kill and malice aforethought*

While instructing the jury, the trial court stated: "Remember that I said that malice is express when there is manifested an intention unlawfully to kill a human being? It just occurs to me now that that definition would include manslaughter. [¶] And so just look at it this way. Manslaughter, as I have described it to you, is an exception to the existence of malice when there is an intention unlawfully to kill a human being. It's malice if it's not manslaughter, and intention to kill, in other words, if there is not that adequate provocation which I've described in these instructions."

We agree with defendant that these comments did little to clarify the difference between murder and voluntary manslaughter. Nevertheless, the trial court's other instructions accurately defined the elements of voluntary manslaughter, so it is unlikely the jury was confused. Moreover, any conceivable instructional error was harmless: By finding the burglary-murder and robbery-murder special-circumstance allegations true, the jury necessarily rejected the defense's argument that he was guilty only of voluntary manslaughter, a claim based on the defense's theory that the killing did not occur in the course of a burglary or robbery.

### 8. *Instructions on deliberating on greater and lesser crimes*

Defendant contends the trial court's instructions may have led the jury to conclude that it could not consider any lesser included offense *until* it had reached a verdict on murder. Nothing in the court's instructions provided a basis for such belief. The court simply told the jury that if it was "not satisfied beyond a reasonable doubt that the defendant is guilty of the offense charged, and it unanimously so finds . . . the jury may convict him

of any lesser offense if the jury is convinced beyond a reasonable doubt that he is guilty of such lesser offense." This did not misstate the law. (See generally *People v. Kurtzman* (1988) 46 Cal.3d 322 [250 Cal.Rptr. 244, 758 P.2d 572].)

Defendant insists that certain comments in the prosecutor's closing summation increased the possibility that the jury would believe the trial court had in its instructions dictated the order in which the jury was to consider the charges. He is wrong. The prosecutor mentioned that deliberations might be faster if the jury started by considering the charge of first degree murder, because the jury would not have to consider the lesser included offenses if it unanimously agreed defendant was guilty of that crime. But the prosecutor never implied to the jury that it *had* to consider the charges in that order.

### 9. *Failure to instruct on theft as a lesser included offense of robbery*

In its instructions, the trial court defined the crime of theft and told the jury that if defendant decided to take Willis Jones's property *after* killing him, he was guilty of theft, not robbery, and he thus could not be convicted of felony murder on the theory that he killed in the commission of a robbery. The court did not, however, instruct the jury on the crime of theft as a lesser included offense. Defendant contends it should have done so, pointing out that theft is a lesser included offense of the crime of robbery. Defendant, however, was charged with murder, not robbery, and theft is not a lesser included offense of murder. Therefore, the court did not have to instruct on theft as a lesser included offense. (*People v. Silva* (2001) 25 Cal.4th 345, 371 [106 Cal.Rptr.2d 93, 21 P.3d 769].)

### 10. *Instructions on burglary and robbery special circumstances*

The trial court instructed the jury on the two special circumstances alleged in the information—that the murder occurred in the commission of a burglary and a robbery—and told the jury that if it convicted defendant of first degree murder it must "determine if murder was committed under one or both" of the charged special circumstances. Defendant contends the trial court should not have instructed the jury on both special circumstance allegations because they formed an indivisible course of conduct. He argues that by permitting the jury to find both allegations true, the trial court artificially inflated the seriousness of the murder defendant committed.

We disagree. The two special circumstances focused on two separate egregious aspects of the murder defendant committed: He killed Willis Jones after entering Jones's home with the intent to commit theft (burglary), and

he killed in the course of forcibly taking Jones's property with the intent to permanently deprive Jones of that property (robbery). Nothing in the federal Constitution, the state Constitution, or in the statutory scheme prohibited the prosecution from charging both of these special circumstances, regardless of whether they occurred in the same course of conduct. (See *People v. Coleman* (1989) 48 Cal.3d 112, 146 [255 Cal.Rptr. 813, 768 P.2d 32]; *People v. Melton* (1988) 44 Cal.3d 713, 767 [244 Cal.Rptr. 867, 750 P.2d 741].)

### 11. *Unanimity instructions*

 Defendant contends the trial court should have instructed the jury that it must unanimously agree on the *facts* on which it based its verdict. He points out that in his closing argument the prosecutor said the jury could convict defendant of murder with special circumstances if it found that either of two factual scenarios occurred: (1) Defendant stacked property belonging to Willis Jones next to the door before beating him to death, or (2) he stacked up the property in between two beatings. According to defendant, the jury could not convict him of first degree murder unless it unanimously agreed on one of these scenarios. He is incorrect. A unanimity requirement generally applies to acts that could have been charged as separate offenses, and a unanimity instruction must be given " 'only if the jurors could other-wise disagree which act a defendant committed and yet convict him of the crime charged.' " (*People v. Beardslee* (1991) 53 Cal.3d 68, 93 [279 Cal.Rptr. 276, 806 P.2d 1311].) Here, the evidence showed only one act that could form the basis for the murder conviction: the act of beating Jones to death. Although the evidence was unclear as to whether that act occurred before or after defendant stacked Jones's property next to the door, this ambiguity about *when* it occurred did not necessitate a multiple acts instruction.

Defendant also faults the trial court for not instructing the jury that it could not convict him of first degree murder absent unanimity on the *legal theory* underlying the conviction. He notes that the jury was told it could convict him of first degree murder if it found either that he killed Jones in the commission of a burglary or robbery, or that the killing was premeditated and deliberate. According to defendant, the jurors had to unanimously agree on one of these theories. We have in the past repeatedly rejected such a contention. (See, e.g., *People v. Box* (2000) 23 Cal.4th 1153, 1212 [99 Cal.Rptr.2d 69, 5 P.3d 130].) Moreover, any conceivable error in failing to require unanimity was harmless, because the jury unanimously agreed that the killing occurred in the course of a burglary and a robbery when it found the burglary-murder and robbery-murder special-circumstance allegations to be true.

## 12. *Intoxication instructions*

After instructing the jury that the mental state of malice aforethought is a necessary element of the crime of murder, the trial court said: "If the evidence shows that the defendant was intoxicated at the time of the alleged offense of murder or at the time it is claimed that he committed a burglary or robbery or voluntary manslaughter, then the jury should consider his state of intoxication in determining if defendant had such specific intent or mental state."

Defendant argues this instruction was misleading because it did not mention that his intoxication might have been relevant not only to whether he harbored malice, but also to whether he acted with premeditation and deliberation. By failing to mention the latter mental states, he argues, the trial court erroneously implied to the jury that voluntary intoxication could not negate premeditation and deliberation.

Assuming for the sake of argument that the instruction should also have mentioned premeditation and deliberation, the error was harmless. The prosecution argued not only that defendant was guilty of first degree murder because the killing was premeditated and deliberate, but it also maintained that the killing occurred in the course of a robbery and burglary, and that therefore defendant was guilty of first degree murder under the felony-murder rule. The jury unanimously accepted the latter theory when it found the robbery-murder and burglary-murder special circumstances true. Under this theory, the jury did not have to decide whether defendant acted with premeditation and deliberation. Thus, the trial court's failure to instruct on the effect of voluntary intoxication on defendant's ability to premeditate and deliberate could not have affected the jury's verdict.

## 13. *Instructions not given*

The trial court instructed the jury on the lesser included offense of second degree murder, that is, an unpremeditated killing with malice aforethought. The court told the jury that malice is *express* when the killing is intentional. But the court did not tell the jury that malice may be *implied* when a killing results from an intentional act, the natural consequences of which are dangerous to human life, that is deliberately performed with knowledge of the danger and conscious disregard for human life. After the case had been submitted to the jury, the trial court explained to the prosecutor and defense counsel that it had decided not to give the instruction because, at defendant's request, it had also not given a related instruction on second degree murder. Defense counsel replied that he "went along" with that decision.

Defendant now asserts the trial court should have instructed on implied malice. We need not decide whether the court should have done so, or whether defendant invited any error by asking the court not to instruct on second degree murder. The jury found true special circumstance allegations that defendant killed the victim in the course of a burglary and a robbery. Therefore, any conceivable error in refusing to instruct on implied malice was harmless. (*People v. Earp, supra,* 20 Cal.4th 826, 885-886.)

Defendant contends the trial court erred in not instructing the jury that it could consider defendant's false statements to the police and his efforts to destroy evidence as showing consciousness of guilt. Although, as the Attorney General concedes, the trial court should have done so (see *People v. Breaux* (1991) 1 Cal.4th 281, 303-304 [3 Cal.Rptr.2d 81, 821 P.2d 585]), the instructions would have benefited the prosecution, not the defense, and therefore the court's failure to give them was harmless.

### 14. *Failure to give written instructions*

Defendant asked the trial court to give the jury a written set of instructions. After the prosecutor objected, the trial court ruled it would provide written instructions only if the jury asked for them. The jury never requested written instructions. Defendant contends the complexity of the instructions necessitated that they be given in writing, and the trial court abused its discretion by refusing to do so.

We rejected similar contentions in *People v. Danielson* (1992) 3 Cal.4th 691, 710-711 [13 Cal.Rptr.2d 1, 838 P.2d 729] and in *People v. Sheldon* (1989) 48 Cal.3d 935, 943-945 [258 Cal.Rptr. 242, 771 P.2d 1330], each of which involved a trial of a defendant charged with capital murder and instructions of comparable complexity to those given here. In each case, we held the trial court did not abuse its discretion when it chose not to give the jury written instructions. Defendant argues *Danielson* is distinguishable because there we noted that the jury did not ask the trial court to reread the instructions, whereas here the jury asked that certain instructions be reread. (See pt. II.E.16., *post.*) But in *Sheldon* the jury asked the trial court to reread the penalty phase instructions, and we nonetheless found that the court did not err in denying the defendant's motion to provide written instructions. We reach the same conclusion here. Whether to give written instructions in the absence of a request from the jury is a matter entrusted to the trial court's discretion. (§ 1093, subd. (f).) We suggest, however, that in capital cases the trial court should generally give the jury written instructions to cure the inadvertent errors that may occur when the instructions are read aloud (see, e.g., *People v. Majors* (1998) 18 Cal.4th 385, 410 [75 Cal.Rptr.2d 684, 956

P.2d 1137]; *People v. Osband* (1996) 13 Cal.4th 622, 717 [55 Cal.Rptr.2d 26, 919 P.2d 640]; *People v. Davis* (1995) 10 Cal.4th 463, 542 [41 Cal.Rptr.2d 826, 896 P.2d 119]; *People v. Crittenden, supra,* 9 Cal.4th 83, 138; *People v. Garceau* (1993) 6 Cal.4th 140, 189-190 [24 Cal.Rptr.2d 664, 862 P.2d 664]; *People v. Andrews* (1989) 49 Cal.3d 200, 216 [260 Cal.Rptr. 583, 776 P.2d 285]; *People v. McLain* (1988) 46 ·Cal.3d 97, 111, fn. 2 [249 Cal.Rptr. 630, 757 P.2d 569]), and because the jury may find the instructions, which are usually long and complex, easier to understand if it has the opportunity to read them.

Defendant contends the trial court's failure to give written instructions violated the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal Constitution and corollary provisions of the state Constitution. We disagree. "There is no constitutional right to have a physical copy of the jury instructions with the jury during deliberations." (*People v. Blakley* (1992) 6 Cal.App.4th 1019, 1023 [8 Cal.Rptr.2d 219]; see also *People v. Cooley* (1993) 14 Cal.App.4th 1394, 1399 [18 Cal.Rptr.2d 346].)

Defendant also asserts the trial court should have told the jury it had a right to request written instructions. (See § 1093, subd. (f) ["Upon the jury retiring for deliberation, the court shall advise the jury of the availability of a written copy of the jury instructions."].) The Attorney General concedes the court erred, but contends the error was harmless. We agree. The trial court told the jury it would reread the instructions upon request, and when the jury asked the court to reread certain instructions, it did so. The jury expressed no inability to understand the instructions, and deliberated only a day before returning its verdict. It is not reasonably probable that the verdict would have been different if the court had told the jury of its right to ask for written instructions. (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

### 15. *Cumulative instructional error*

Defendant argues that even if the instructional errors alleged above were not individually prejudicial, cumulatively they violated his right to "due process, a fair trial, to a reliable determination of guilt and penalty, to have the jury determine every material issue presented by the evidence, to present a defense, and to adequate assistance of counsel . . . ." We have found only one instructional error (the trial court's failure to instruct on defendant's false statements and his efforts to destroy evidence). For the sake of argument, however, we have assumed that the court committed several such errors. In each of these instances, we have found them harmless. The combined effect of such errors did not deny defendant due process, a fair trial, or any other constitutional right.

### 16. *Answer to jury's question*

 During its deliberations, the jury sent the trial court a note asking for the definitions of burglary and robbery, and for the instructions on felony murder and first degree murder with special circumstances. After consulting with counsel, the trial court told the jury it was uncertain whether the jury wanted "a complete set of instructions on first degree murder or only felony murder." Two jurors responded. Juror W. replied: "Burglary, robbery and murder with special circumstances." Juror E. replied: "The difference between felony murder and first degree murder with special circumstances." The trial court then reread to the jury the instructions defining murder, robbery, burglary, and the alleged special circumstances.

Defendant argues the trial court erred in not explaining the difference between felony murder and first degree murder with special circumstances, as Juror E. had requested. We disagree. The jury was not given written copies of the instructions, and its note appeared to ask the court to reread certain instructions pertinent to its decision. Juror E. merely attempted to elaborate on the note by explaining which instructions should be reread. The trial court could reasonably have concluded that it could answer Juror E.'s question by rereading the instruction defining felony murder and the instruction defining the elements of the felony-murder special circumstance.

### F. *Cumulative Effect of Guilt Phase Errors*

Defendant contends the cumulative effect of the errors at the guilt phase of his capital trial require reversal of his murder conviction and the special circumstance findings. We disagree. The few errors we have identified were minor and, either individually or cumulatively, could not have altered the trial's outcome.

### III. PENALTY PHASE ISSUES

### A. *Failure to Discharge Juror J.*

 At defendant's first court appearance after the jury returned its guilt phase verdict, defendant told the court that during closing argument Juror J. had, while rubbing her eye, made an obscene gesture towards him with the middle finger of her hand. The trial court questioned J., who denied making the gesture. The court admonished her not to discuss the matter with the other jurors, and after she left the courtroom defendant insisted he had seen J. make the gesture. The court denied defendant's motion to discharge J., ruling that she had no intent to make an obscene gesture and if she made the gesture at all it was inadvertent.

Defendant argues the trial court inadequately inquired into the matter, because it denied his request to query the other jurors to determine whether J. was biased and whether the alleged bias had tainted other jurors. As a result, he asserts, the court erred in denying his motion to discharge J. We disagree. The specific procedures to follow in investigating an allegation of juror misconduct are generally a matter for the trial court's discretion. (*People v. Beeler, supra,* 9 Cal.4th 953, 989.) Here, the court reasonably concluded that once it had found that J. did not intend to make an obscene gesture, there was no need to question the remaining jurors.

## B. *Admission of Defendant's Prior Convictions*

On August 12, 1988, six weeks before trial, the prosecution gave the defense written notice of the evidence it intended to present in aggravation at the penalty phase of trial. (§ 190.3.) One item listed in the notice was, "The defendant's conviction for larceny from person [*sic*] occurring in the state of Michigan on or about August 17, 1967. The defendant was committed to state prison with prisoner number A-118636." Defendant sought discovery of the documents the prosecution intended to present to prove this conviction. On August 31, 1988, Judge Edward Webster, to whom the case was then assigned for trial, warned the prosecutor to provide discovery by September 26, 1988, stating that unless he did, "I probably won't allow that information to come in at the penalty phase." The prosecutor, however, did not give defendant the requisite information until November 1988, after commencement of the guilt phase testimony. Meanwhile, the case had been reassigned to Judge George Grover. He permitted the prosecutor to present the documents in question at the penalty phase, overruling defendant's objection that he had been denied timely discovery. The prosecution introduced the prior conviction into evidence at the penalty phase on January 4, 1989.

Defendant argues that the prosecution's belated compliance with Judge Webster's August 1988 discovery order violated section 190.3. Not so. Section 190.3 requires the prosecution only to give the defense *notice* of the evidence it intends to introduce, not to *produce* it. (*People v. Roberts* (1992) 2 Cal.4th 271, 330 [6 Cal.Rptr.2d 276, 826 P.2d 274].) Here, the prosecutor's notice, given six weeks before trial, adequately complied with section 190.3. (See generally *People v. Williams* (1997) 16 Cal.4th 153, 234-235 [66 Cal.Rptr.2d 123, 940 P.2d 710].)

Defendant contends that even if there was no statutory violation, the prosecutor violated Judge Webster's August 31, 1988 discovery order, which defendant describes as "mandatory," by failing to provide discovery by

September 26, 1988, as ordered. Because of this alleged violation, defendant argues that Judge Grover should either have excluded the Michigan conviction or granted him a continuance to look into the matter. But Judge Webster never said compliance with the discovery order by September 26 was *mandatory*, only that he would "probably" exclude the conviction if the prosecutor had not provided discovery by that time. Defendant also maintains that Judge Webster issued a written order requiring discovery that was lost when portions of the file were inadvertently destroyed (see pt. IV.F., *post*), noting that Judge Grover appeared to mention such an order when ruling on the admissibility of the evidence of the prior conviction. Assuming for the sake of argument that Judge Webster issued such an order, Judge Grover did not abuse his broad discretion (see *People v. Jenkins, supra*, 22 Cal.4th 900, 950-952) in ruling that defendant suffered no prejudice from the prosecutor's delay in furnishing discovery, and that exclusion was an inappropriate sanction for the delay. Nor did Judge Grover err in failing to grant defendant a continuance, because defendant never asked for one.

Defendant argues the prosecutor committed misconduct when, in proceedings before Judge Grover, he inaccurately described Judge Webster's order. We have examined the prosecutor's comments cited by defendant and find no misrepresentation.

Defendant faults the trial court for not granting his motion to strike the 1967 Michigan conviction as constitutionally invalid because he was not advised of his right to confront adverse witnesses when he pled guilty to that offense. (See *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449] [defendants entering guilty pleas must be advised of rights to jury trial and to confront adverse witness, and the privilege against self-incrimination].) We disagree. The court correctly ruled that defendant could not collaterally attack the prior conviction on that ground because he had entered his guilty plea in the Michigan case two years before we decided *Tahl*, which was not retroactive. (See *People v. Allen* (1999) 21 Cal.4th 424, 442-443 [87 Cal.Rptr.2d 682, 981 P.2d 525].)

Defendant also contends the trial court erred in permitting the prosecution to introduce evidence of his two 1964 burglary convictions. Pointing out that the convictions were 25 years old and were sustained when he was only 18, he maintains they bore no relevance to the determination whether he should be executed. Because defendant did not object on that ground at trial, he may not raise this issue. (Evid. Code, § 353, subd. (a).) In any event, notwithstanding their remoteness, the two prior burglary convictions were admissible to show that prior successful felony prosecutions did not deter defendant from committing the capital offense in this case. (*People v. Bacigalupo*,

*supra*, 1 Cal.4th 103, 140; *People v. Anderson* (1990) 52 Cal.3d 453, 477 [276 Cal.Rptr. 356, 801 P.2d 1107].)

### C. *Nonstatutory Aggravating Evidence*

 As previously mentioned, the prosecution presented evidence that defendant and another man robbed a restaurant in Riverside, and that defendant was convicted of robbery and assault arising out of that incident. We reject defendant's claim that the prosecution's use of this evidence violated his Fifth Amendment protection against double jeopardy because it amounted to a relitigation of the facts of the robbery. (See, e.g., *People v. Osband, supra*, 13 Cal.4th 622, 711.)

Defendant contends the trial court should not have admitted, over his objection, testimony that just before his arrest for the restaurant robbery he threw the gun used in the crime into some nearby bushes, evidence the prosecutor used to argue defendant's leadership role in the robbery. Defendant claims the evidence was irrelevant to any of the aggravating factors the jury could consider in imposing the death penalty because it involved unadjudicated, nonviolent behavior. He argues that its admission violated his "liberty interest in the jury's proper exercise of discretion provided by state law, and his due process protection against arbitrary state deprivation . . . , and his Eighth and Fourteenth Amendment right to heightened reliability and due process in this capital case." To the contrary, the evidence was part of the circumstances of the restaurant robbery and therefore admissible as violent criminal activity under section 190.3, factor (b). (See *People v. Cooper* (1991) 53 Cal.3d 771, 840-841 [281 Cal.Rptr. 90, 809 P.2d 865].)

### D. *Motion for Continuance*

 Penalty phase testimony ended at noon on Thursday, January 12, 1989. Defense counsel then sought a continuance of one and a half to two hours to prepare his final argument, but he did not say he needed the time to be adequately prepared to argue the case. Rather, he expressed concern that the case would be submitted to the jury early on Friday afternoon, and he feared the jury would return a quick verdict rather than continue deliberating after a long holiday weekend. He sought the continuance to ensure that the case would not be submitted to the jury before the following Tuesday. The trial court denied the motion. This, defendant asserts, was error.

We disagree. Defense counsel's tactical concerns about when the case would be submitted to the jury were not good cause to continue the matter, and the trial court acted well within its discretion when it denied the motion.

### E. *Prosecutorial Misconduct*

#### 1. *Future dangerousness*

██ Defendant contends that in cross-examination and closing argument, the prosecutor "manipulated" defendant's mitigating evidence to support the prosecutor's argument that defendant suffered from an antisocial personality disorder and was violent and uncontrollable, and that defendant was therefore likely to harm other inmates if sentenced to life imprisonment without possibility of parole. There was no impropriety in the prosecutor's conduct. The defense offered expert testimony that defendant had "a high ability to function without any particular problems in a structured environment like a prison setting." The prosecutor was entitled to refute that testimony by cross-examining the expert about evidence that defendant might behave violently in prison, and by relying on that evidence in closing argument. (*People v. Morris* (1991) 53 Cal.3d 152, 219 [279 Cal.Rptr. 720, 807 P.2d 949].)

#### 2. *Implying defendant had other prior convictions*

██ Defendant complains that on two occasions the prosecutor asked questions implying that defendant had additional criminal convictions not known to the jury. Defendant's failure to object on either occasion precludes him from raising this issue. (*People v. Hines, supra,* 15 Cal.4th 997, 1045.)

#### 3. *Improper cross-examination of Dr. Conolley*

██ Testifying as a defense expert, Dr. Edward Conolley said defendant suffered from an anxiety disorder, he had an "avoidant" and "dependent" personality type, and defendant's most likely personality diagnosis was an "atypical combination of avoidant, paranoid, and borderline." On cross-examination, the prosecutor challenged this diagnosis, suggesting that defendant had an antisocial personality disorder or was simply a violent thief. Using a chart listing the types of behavior that the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (3d ed. rev.) (DSM-III-R) identifies as being indicative of antisocial personality disorder, the prosecutor asked Dr. Conolley whether defendant had manifested each of these types of behavior. Based on Dr. Conolley's answers, the prosecutor drew a plus sign on the chart to show that defendant had exhibited the particular behavior, a minus sign indicating the absence of such behavior, and both signs to show insufficient evidence to determine whether defendant had exhibited the particular behavior.

Defendant argues the prosecutor's cross-examination of Dr. Conolley and his use of the chart violated defendant's right to "confrontation, a fair trial,

assistance of counsel, due process, and a reliable determination of guilt and penalty, as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and corollary provisions of the state Constitution and state laws." He acknowledges the prosecutor was entitled to try to rebut Dr. Conolley's diagnosis, but he contends the prosecutor went "beyond rebuttal" in using Dr. Conolley's testimony to support his own conclusion that defendant was antisocial or sociopathic.

Defendant has not preserved this argument for appeal because at trial he did not object on any of the grounds mentioned above. Defendant maintains he did object. He is wrong. He merely objected to certain questions pertaining to crimes he had committed. Moreover, even if the claim had been preserved, it would not be meritorious. In his attempt to undermine Dr. Conolley's diagnosis of defendant's behavior, the prosecutor was entitled to ask whether an alternate diagnosis—that defendant suffered from an antisocial personality disorder—might be more consistent with the evidence, and he was entitled to use the chart to illustrate to the jury that defendant exhibited many of the characteristics of the latter disorder.

According to the DSM-III-R, persons with antisocial personality disorder typically commit "theft without confrontation of a victim" before age 15. When the prosecutor asked Dr. Conolley whether defendant had engaged in such behavior, Conolley replied that defendant had admitted stealing from a neighbor when defendant was a student in the ninth or tenth grade. Defendant faults the trial court for permitting the prosecutor to elicit this testimony. Defendant never objected to this testimony. In any event, any impropriety in the prosecutor's questioning was so minor that there is no reasonable possibility the result of the penalty phase would have been different if the court had refused to allow the prosecutor to inquire into the matter.

The DSM-III-R also says that persons with antisocial personality disorder often steal *with* confrontation of a victim before the age of 15. In an apparent attempt to show that defendant had exhibited similar behavior, the prosecutor asked Dr. Conolley if one of defendant's 1974 burglary convictions, which occurred when he was *18* years old, involved confrontation with the victim. After defendant objected, the parties and the trial judge discussed the issue in chambers, after which the prosecutor agreed to drop the inquiry. Defendant argues the jury may have inferred from the prosecutor's question to Dr. Conolley that defendant confronted the victim. We disagree. The trial court told the jury not to draw such inferences when it instructed: "You must never assume to be true any insinuation suggested by a question asked a witness. A question is not evidence and may be considered only as it supplies meaning to the answer."

As another type of behavior indicative of antisocial personality disorder, the DSM-III-R mentions frequent initiation of fights as a child. In cross-examination, Dr. Conolley said that as a child defendant was considered "tough" by other boys and he had been involved in fights. Dr. Conolley did not know, however, whether defendant had frequently initiated such fights. The prosecutor put a plus and a minus sign on his chart to show Dr. Conolley's lack of knowledge as to whether defendant had this particular attribute indicative of an antisocial personality disorder. Defendant characterizes the prosecutor's questions as "prejudicial innuendo" that implied the prosecutor's belief that as a child defendant had initiated fights. Defendant, however, never objected to these questions and in any event they were a ·permissible attempt to test the strength of Dr. Conolley's diagnosis.

In response to questions by the prosecutor, Dr. Conolley testified that at the time of the murder defendant's sources of income were Thelma Garrett's welfare checks and her "outside activities" (that is, her acts of prostitution). Defendant argues this evidence was inadmissible because it implied he was a "welfare leech," which is not among the aggravating factors the jury may consider in deciding whether to impose the death penalty. Because of defendant's failure to object at trial, he may not raise this issue. (Evid. Code, § 353, subd. (a).)

While cross-examining Dr. Conolley, the prosecutor asked a question implying that defense counsel had improperly failed to provide the prosecutor with information that Dr. Conolley had used in evaluating defendant. When defense counsel objected, the prosecutor withdrew the question, but he asked the trial court, in the jury's presence, to order Dr. Conolley to provide that information. As the prosecutor started to describe the meager information he had received, the trial court interrupted, warning him not to make any further statements. Defendant argues the prosecutor's tactics impugned defense counsel's integrity by implying that counsel had withheld evidence. We agree with defendant that the prosecutor should not have raised the issue in front of the jury. Given the relatively minor nature and brevity of the prosecutor's comments to the trial court, we conclude they could not have affected the outcome of the penalty phase.

Defendant accuses the prosecutor of improper conduct when, in cross-examination of Dr. Conolley, the prosecutor asked numerous questions implying that defendant had lied in his interviews with Conolley. Defendant's failure to object to these questions bars him from now raising the issue. (*People v. Hines, supra*, 15 Cal.4th 997, 1045.) Moreover, the questions were proper: Dr. Conolley's diagnosis of defendant relied heavily on information provided by defendant, and the prosecution was therefore entitled to ask questions challenging the accuracy of that information.

### 4. *Closing argument*

 Defendant asserts the prosecutor committed numerous acts of misconduct in closing argument. Defendant failed to object to any of the alleged instances of misconduct, so he may not now assert them. (*People v. Hines, supra,* 15 Cal.4th 997, 1062.)

Moreover, with two possible exceptions, defendant's claims of misconduct lack merit. Specifically, (1) the prosecutor did not commit misconduct by arguing that defendant committed two attacks on the victim, because, as previously explained, evidence in the record supports this theory; (2) the prosecutor was entitled to argue that defendant killed Jones to eliminate him as a witness, because the evidence was reasonably susceptible to this interpretation; (3) the prosecutor properly discussed alternative versions of the events leading to the murder, because the jury's guilt phase verdict did not clearly indicate which version it believed, and the prosecutor maintained that death was warranted under any of the possible scenarios; (4) the prosecutor did not commit misconduct by arguing defendant was a threat to other prisoners and to guards if sentenced to life imprisonment without possibility of parole, because the argument refuted defendant's contention that he would behave well in prison and was based on evidence in the record; (5) the prosecutor did not argue defendant's failure to confess, lack of remorse, and lack of emotion as aggravating factors, and he did not misrepresent the evidence when he discussed these matters; (6) the prosecutor did not convey a personal belief that defendant should be executed when he told the jury, "I want you to return a death verdict," because, in context, his comment merely expressed the view that the evidence warranted this punishment; (7) the prosecutor never suggested that defense counsel believed defendant deserved the death penalty; (8) the prosecutor did not ask the jury to ignore defendant's mitigating evidence, but merely argued that the circumstances of the murder outweighed that evidence; (9) the prosecutor did not undermine the court's instructions when he discussed the question of sympathy for defendant, because he acknowledged that the jury was entitled to consider sympathy; (10) the prosecutor never implied that the jury did not have the final responsibility for sentencing; (11) the prosecutor did not tell the jury it could *choose* whether to weigh the penalty phase evidence.

It is a closer question whether the prosecutor acted properly when he criticized defendant for "living on the proceeds of . . . Thelma Garrett"; when he argued that in the past the prison system had treated defendant very leniently; and when he asserted that defendant "hurts people, time and time again," notwithstanding the lack of evidence that defendant had physically injured anyone before the murder in this case. But as pointed out earlier,

defendant did not object to these comments. Besides, it is not reasonably possible that these passing remarks by the prosecutor could have altered the outcome of the penalty phase.

### 5. *Cumulative effect of misconduct; failure to object*

Defendant asks us to excuse his failure to object to the above described instances of alleged prosecutorial misconduct because the misconduct was so pervasive that repeated objections would have alienated the jury, and because objections would have reinforced, rather than cured, the prejudicial effect of the misconduct. Not so. As discussed earlier, only in very few instances[2] did the prosecutor engage in improper conduct, which, as we explained, was of a relatively minor nature. Defendant also contends the cumulative effect of the prosecutor's misconduct was to violate his right to due process of law. Considered individually or cumulatively, these instances did not constitute prejudicial misconduct.

### F. *Photographs*

Earlier, we rejected defendant's contention that the trial court erred in admitting certain photographs depicting the victim's injuries. (See pt. II.C.6., *ante.*) Similarly, we reject defendant's contention that admission of these photographs prejudiced him at the penalty phase.

### G. *Instructional Errors*

#### 1. *Failure to instruct that jurors should rely on instructions rather than counsel's argument*

Defendant contends the trial court should, on its own initiative, have instructed the jury to follow the court's instructions, rather than the arguments of counsel, when there was a conflict between them. Such an instruction, which is now part of CALJIC No. 1.00, may be preferable, but it is not essential. The court told the jury of its "duty" to arrive at a verdict by applying "the rules of law that I state to you," and to "accept and follow the rules of law *as I state them to you.*" (Italics added.) This adequately told the jury that the trial court's description of the law was controlling.

#### 2. *Inviting the jury to double-count the underlying felony*

While instructing the jury at the penalty phase, the trial court defined the crime of burglary. The court did so because the prosecution had

---

[2]As explained above, solely for the sake of argument we have assumed that certain acts of the prosecutor were misconduct.

presented, as part of its case-in-aggravation, evidence that defendant had twice been convicted of that offense. The court defined burglary as the entry into a building with "the specific intent to steal . . . or . . . *to commit a felony.*" (Italics added.) Defense counsel immediately asked to approach the bench. He pointed out that for purposes of the felony-murder rule and the burglary-murder special circumstances, which pertained to the murder of Willis Jones, at issue in this case, the court's definition was improper because it included an entry with the intent to commit a felonious assault on Jones. (See generally *People v. Sanders* (1990) 51 Cal.3d 471, 509, 517 [273 Cal.Rptr. 537, 797 P.2d 561].) He expressed concern that if the jury were to have a lingering doubt as to whether defendant had entered Jones's home with the intent to commit *theft*, the court's definition might confuse the jurors.

In response, the trial court told the jury that "the only burglary at the Jones residence that has been charged, is a burglary with intent to commit theft," and the court reminded the jury of the guilt phase instruction that there was no burglary if defendant did not enter Jones's home with intent to commit theft. The court added: "And in the two burglaries that are alleged as aggravating circumstances, the only thing involved is a charge that the entry was made with intent to commit theft."

Seizing on this last sentence, defendant argues that the trial court, by discussing the burglary-murder special circumstance in conjunction with defendant's prior convictions for burglary, may have misled the jury into believing that it could consider defendant's burglary of Willis Jones's home as a separate aggravating factor under section 190.3, factor (c). We disagree. The trial court's comments in no way suggested that the jury could consider the burglary of Jones's house under factor (c). Moreover, another instruction by the court correctly explained that the only matter the jury could consider under factor (c) was this: "The presence or absence of any prior felony conviction, *other than* the crime for which the defendant has been tried in the present proceedings." (Italics added.)

3. *Instructions on sympathy*

At the penalty phase, the trial court told the jury: "*You must not be influenced by pity for a defendant* or by prejudice against him." (Italics added.) But it also instructed the jury that "in this part of the trial, the law permits you to be influenced by mercy, sentiment and sympathy for the defendant." It later reiterated the point when it explained to the jurors that at the guilt phase it had instructed the jury not to consider sympathy for defendant, but "[a]t the penalty phase you may do so, that is, consider

[sympathy]." The court also told the jury that it could consider "any *sympathetic* or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death" (italics added), and that it could "assign whatever *sympathetic* value" (italics added) it deemed appropriate to each of the factors in aggravation and mitigation.

Although the trial court should not have told the jury not to consider pity for defendant, there is no reasonable possibility that this misstatement misled the jury. The court repeatedly told the jury that sympathy for defendant could play a role in its verdict. Also, the prosecutor ("you can consider sympathy") and defense counsel ("you can consider things like mercy, sentiment, and sympathy for the defendant in arriving at a verdict") told the jury it could consider sympathy.

There is no merit to defendant's contention that the jury may have understood the trial court's instructions to say it could consider sympathy for the victim. The trial court's instructions repeatedly told the jury that it could consider sympathy for *defendant*. (See generally *People v. Hardy* (1992) 2 Cal.4th 86, 203 [5 Cal.Rptr.2d 796, 825 P.2d 781]; *People v. Mickey* (1991) 54 Cal.3d 612, 695 [286 Cal.Rptr. 801, 818 P.2d 84].)

### 4. *Instruction on defendant's credibility*

In instructing the jury at the penalty phase, the trial court said, "As I have previously advised you, in considering the credibility of the defendant you may consider only his felony convictions in 1980 in connection with the incident at the Lucky Greek restaurant." Defendant claims that this instruction erroneously told the jury that it should consider *only* his 1980 felony convictions, and to disregard other factors ordinarily pertinent in evaluating witness credibility, such as demeanor, bias, and the ability to remember the events in question. It is not reasonably likely that the jury construed the court's words in this fashion, rather than giving them their correct meaning—that in evaluating defendant's credibility, the jury could consider his 1980 felony convictions, but not his other criminal convictions.

Shortly after that instruction, the prosecutor asked the court to clarify the purpose for which defendant's other felony convictions could be used. The court then told the jurors, "[Y]ou may determine that [defendant's other felony convictions] are aggravating circumstances for the purpose of deciding the punishment to be imposed. [¶] And I mentioned the defendant's credibility, because he was a witness at the first part of the trial, and that first part may be considered by you in connection with your determination of the penalty." Defendant argues that the court's juxtaposition of the credibility

instructions with the comments about aggravating circumstances may have caused the jury to believe it could consider defendant's lack of credibility as an aggravating factor. But the instructions did not tell the jury it could consider defendant's credibility as an aggravating factor, and it is not reasonably likely that the jury could have misconstrued the instructions in the manner posited by defendant.

### 5. *Other claims of instructional errors*

At the guilt phase, the trial court had instructed the jury to return a just verdict regardless of the consequences. At the penalty phase that followed, the court told the jury to apply all guilt phase instructions, and it gave a modified version of the standard instruction on circumstantial evidence. Defendant argues that these instructions, considered together, suggested "that the law requires a particular outcome," in violation of *People v. Brown, supra,* 40 Cal.3d 512, 541. The point of defendant's argument is unclear, and we find no error.

Defendant contends the trial court's circumstantial evidence instruction reduced the prosecution's burden of proof and permitted the jury to return a judgment of death if it found such a judgment was "reasonable." This is little different from defendant's attack on the circumstantial evidence instruction given at the guilt phase of trial, which we have already rejected. (See pt. II.E.6., *ante.*)

According to defendant, the trial court, on its own initiative, should have instructed the jury to draw no adverse inferences from his failure to testify at the penalty phase. It was not required to do so. (See, e.g., *People v. Hamilton* (1988) 46 Cal.3d 123, 153 [249 Cal.Rptr. 320, 756 P.2d 1348].)

Defendant also claims the trial court's instruction that the jury could consider whether the murder was committed "while the defendant was under the influence of *extreme* mental or emotional disturbance" (italics added) was unconstitutionally vague and prevented the jury from considering defendant's evidence that he suffered from milder degrees of mental or emotional disturbance. The instruction was proper, as we have often held. (See, e.g., *People v. Lucero, supra,* 23 Cal.4th 692, 728; *People v. Ghent* (1987) 43 Cal.3d 739, 776 [239 Cal.Rptr. 82, 739 P.2d 1250].)

Defendant faults the trial court for these instructions: The trial court told the jury to be guided by the statutory factors in aggravation and mitigation "to the extent that they are *applicable.*" (Italics added.) Later, the court told the jury to "consider, take into account and be guided by the *applicable*

factors of aggravating and mitigating circumstances upon which you have been instructed." (Italics added.) Seizing on the court's use of the word "applicable," defendant contends these two instructions invited the jury "to disregard any evidence the jury felt was not relevant to applicable factors," thereby encouraging the jury not to consider relevant evidence. But the instructions did not tell the jury to disregard *evidence*, relevant or otherwise; they merely told the jury not to consider those factors in aggravation and mitigation that the jury found inapplicable. The court's use of the word "applicable" was not improper.

While the trial court was instructing the jury on circumstantial evidence, the prosecutor asked to approach the bench. He asked the court to explain that the circumstantial evidence instruction would apply to evidence of violent criminal conduct that the prosecution had introduced at the penalty phase. Thereafter, the court told the jury it had to determine the existence of certain aggravating circumstances, one of which the court described as "convictions" and the other as "criminal activity." The court explained that in evaluating evidence of criminal activity, the jury was to follow the instructions on reasonable doubt and on circumstantial evidence. Later, when instructing on reasonable doubt, the court said: "In the case of an aggravating circumstance . . . involving criminal activity, and I'll be giving you an instruction . . . on criminal activity, there you must find that the alleged criminal activity is as alleged, as charged, beyond a reasonable doubt."

Defendant argues the instructions just mentioned were wrong because they implied the jury could consider in aggravation any criminal activity committed by defendant, whereas the jury could consider only criminal activity involving force or violence or the threat to use force or violence. (§ 190.3, factor (b).) But when the trial court defined the factors that the jury could consider in aggravation and mitigation, it properly limited the criminal activity the jury could consider to those involving "the use or attempted use of force or violence or the express or implied threat to use force or violence." We find no reasonable likelihood that, given these instructions, the jury did not understand what types of criminal activity it could consider. (See *People v. Clair* (1992) 2 Cal.4th 629, 663 [7 Cal.Rptr.2d 564, 828 P.2d 705] [reasonable likelihood standard applies when reviewing claims of ambiguous instructions].)

Defendant broadly asserts the trial court's instructions allowed the jury to consider evidence of his background, character, and social history as factors in aggravation. He does not, however, identify any particular instructions saying so. In any event, we find nothing in the trial court's instructions that would support defendant's claim.

██ Defendant challenges the trial court's instructions on aggravating and mitigating factors on a variety of grounds, all of which we have rejected in past decisions: A trial court need not instruct the jury that the prosecutor must prove all aggravating factors beyond a reasonable doubt (*People v. Samayoa* (1997) 15 Cal.4th 795, 862 [64 Cal.Rptr.2d 400, 938 P.2d 2]); the court need not instruct that if aggravating and mitigating factors are evenly balanced, the jury must return a judgment of life imprisonment without possibility of parole (*People v. Hayes* (1990) 52 Cal.3d 577, 643 [276 Cal.Rptr. 874, 802 P.2d 376]); the court need not instruct that the jury may decline to impose the death penalty even when there are no mitigating circumstances or the factors in aggravation outweigh those in mitigation (*People v. Ray* (1996) 13 Cal.4th 313, 354-355 [52 Cal.Rptr.2d 296, 914 P.2d 846]; *People v. Medina, supra*, 11 Cal.4th 694, 782); the court need not explain to the jury which factors are mitigating and which are aggravating or delete irrelevant mitigating factors (*People v. Box, supra*, 23 Cal.4th 1153, 1217); the factors listed in section 190.3 are not unconstitutionally vague or arbitrary, and do not result in unreliable sentences (*People v. Lucero, supra*, 23 Cal.4th 692, 741); the jury is not required to return unanimous, written findings (*People v. Osband, supra*, 13 Cal.4th 622, 710); and the standard instruction on the factors in aggravation and mitigation (given in this case) is not unconstitutionally vague and misleading (*People v. Sanchez, supra*, 12 Cal.4th 1, 81).

### 6. *Jury instructions requested by defendant*

Defendant asked the trial court to give a special instruction on lingering doubt. The court gave that part of the proposed instruction defining lingering doubt and telling the jury it could consider lingering doubt as to the truth of the special circumstance allegations as a mitigating factor. But the court deleted from the proposed instruction two sentences explaining the applicability of lingering doubt to this case. Defendant argues the deleted sentences were necessary to explain the concept of lingering doubt to the jury in "meaningful" terms. To the contrary, the sentences in question were largely redundant and the court therefore did not err in deleting them from the instruction.

Defendant faults the trial court for not giving his special instruction No. 10. The proposed instruction said that the mitigating factors mentioned in the court's other instructions were merely examples and the jury should also consider any other mitigating circumstances shown by the evidence; that a single mitigating factor is sufficient to support a determination that death is not the appropriate penalty; that a mitigating factor need only be shown by substantial evidence, and need not be proved beyond a reasonable doubt; and

that the jury could use mercy, sympathy, or sentiment in deciding what weight to give each mitigating factor. The trial court gave only that part of the proposed instruction telling the jury that mitigating factors need not be proved beyond a reasonable doubt. The court acted properly. Parts of the instruction were redundant of other instructions given (e.g., the statement that the jury could consider sympathy), parts of it were wrong (e.g., the statement that mitigating factors need only be shown by substantial evidence), and parts were argumentative (e.g., the statement that one mitigating factor could outweigh all aggravating factors) (see *People v. Hines, supra,* 15 Cal.4th 997, 1069).

Just as meritless is defendant's claim that the trial court should have given his special instruction No. 11. The proposed instruction was merely a modified version of the trial court's concluding instruction, and it added nothing of significance to that instruction by the court.

### 7. *Failure to give the jury a written copy of the penalty instructions*

Defendant contends the trial court erred in not giving the jury written instructions at the penalty phase. The record does not show whether the court gave written instructions, but the court's failure to do so may be inferred from its oral instruction that it would, at the jury's request, reread any instructions. The trial court did not abuse its discretion, for the reasons explained in our discussion of the court's failure to give the jury written instructions at the guilt phase of defendant's capital trial. (See pt. II.E.14., *ante.*)

### 8. *Cumulative effect of errors*

Defendant argues that, considered cumulatively, the errors in the trial court's penalty phase instructions violated not only the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, but also corollary provisions of the state Constitution and state laws. Nothing in the trial court's instructions would have caused the jury to misconstrue its duties at the penalty phase.

### H. *Challenges to Constitutionality of Death Penalty Statute*

Defendant contends that, in theory and in practice, the California death penalty statute fails to adequately narrow the class of offenders eligible for death, in violation of the Eighth Amendment's prohibition of cruel and unusual punishment. He maintains the special circumstances listed in the statute are so broad as to include nearly every first degree murder, thus

failing to perform the narrowing function required by the federal Constitution. We have in the past repeatedly rejected this contention. (See, e.g., *People v. Sanchez, supra*, 12 Cal.4th 1, 60-61.)

Defendant claims the death penalty scheme is unconstitutional because it grants the prosecutor complete discretion to decide whether to seek the death penalty. We have in the past rejected this argument. (See, e.g., *People v. Ayala* (2000) 23 Cal.4th 225, 304 [96 Cal.Rptr.2d 682, 1 P.3d 3].) Equally meritless is his claim that the death penalty scheme is unconstitutional because it does not require this court or the jury to conduct intercase proportionality review. (*Ibid.*)

Defendant argues the jury should ·have been directed to conduct an *intracase* proportionality review, that is, it should have been told to consider the proportionality of the penalty in relation to the severity of the crime he committed. That, however, is precisely what the jury did in making its penalty determination.

Defendant asks this court to invalidate his death sentence on the ground that it was not proportional to his moral culpability. We disagree. Defendant, a career criminal with five prior felony convictions, brutally beat to death an aged, defenseless man so he could rob the victim of his meager possessions. On these facts, the death sentence is not "grossly disproportionate to the defendant's individual culpability" (*People v. Dillon* (1983) 34 Cal.3d 441, 479 [194 Cal.Rptr. 390, 668 P.2d 697]), nor is it " 'disproportionate to the defendant's "personal responsibility and moral guilt" ' " (*People v. Marshall* (1990) 50 Cal.3d 907, 938 [269 Cal.Rptr. 269, 790 P.2d 676]).

Defendant contends the aggravating circumstances in section 190.3, as communicated to the jury through the trial court's instructions, are unconstitutionally vague as applied because they failed to guide and limit the jury's discretion so as to avoid an arbitrary and capricious application of the death penalty. He notes that the jury was allowed to double-count the restaurant robbery both as violent criminal conduct (§ 190.3, factor (b)) and as a prior felony conviction (§ 190.3, factor (c)). He acknowledges that in *People v. Melton, supra*, 44 Cal.3d 713, 764-765, we held that the jury may engage in such double-counting, but he points out that here the jury was not told of the constitutional principles that led us to uphold such double-counting. He offers no explanation as to why the jury must be instructed on these principles, and we perceive none.

Defendant argues that California's death penalty scheme is unconstitutional as applied to his case because it enabled the jury to "triple-count" the

circumstances that he committed the murder in the course of a burglary and a robbery: (1) under the felony-murder rule, to elevate the offense to first degree murder; (2) as a special circumstance, to make defendant eligible for the death penalty; and (3) at the penalty phase, as a "circumstance of the offense." He is wrong. We have previously held that this aspect of the death penalty scheme does not render it unconstitutional. (See *People v. Millwee* (1998) 18 Cal.4th 96, 164, fn. 35 [74 Cal.Rptr.2d 418, 954 P.2d 990]; *People v. Ray, supra,* 13 Cal.4th 313, 358; *People v. Marshall, supra,* 50 Cal.3d 907, 945-946.)

Defendant also contends the statutory aggravating and mitigating circumstances are unconstitutionally vague as applied to his case because they allowed the prosecutor to place before the jury "allegations of events in [defendant's] social history that were likely to be included in the jury's weighing process, even though they did not fit any of the aggravating factors listed in Penal Code section 190.3, nor were they proper rebuttal to mitigation evidence presented by [defendant]." In particular, defendant cites the prosecutor's cross-examination of Dr. Edward Conolley, the psychologist who testified for the defense, for the purpose of showing that defendant suffered from an antisocial personality disorder and would be a danger to others if sentenced to life in prison without possibility of parole, and the prosecutor's closing argument based on that testimony. But, as we have already explained (see pt. III.E.3., *ante*), the evidence presented through the prosecutor's cross-examination of Dr. Conolley was admissible to rebut the mitigating testimony presented by the defense. The prosecutor's use of that evidence did not make the statutory mitigating and aggravating factors unconstitutionally vague as applied to defendant.

Finally, defendant argues that as applied to his case, factor (a) of section 190.3, which permits the jury, in making its penalty decision, to consider "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true . . . ," is unconstitutionally vague. He bases his argument on Justice Blackmun's dissenting opinion in *Tuilaepa v. California* (1994) 512 U.S. 967, 984 [114 S.Ct. 2630, 2641, 129 L.Ed.2d 750]). But a majority of the high court rejected Justice Blackmun's view, holding that factor (a) was not unconstitutionally vague. (512 U.S. at p. 976 [114 S.Ct. at p. 2637].) Defendant here makes no showing that the facts of this case compel a different result.

## I. *Cumulative Effect of Errors*

Defendant argues that the cumulative effect of errors at the guilt and penalty phases, which we discussed above, requires reversal of the judgment

of death. We disagree. The few minor errors, considered singly or cumulatively, were harmless.

## IV. Posttrial Issues and Miscellaneous Other Claims

### A. *Denial of Posttrial Discovery*

As previously mentioned, while the jury was engaged in penalty deliberations two articles appeared in a local newspaper that said the Riverside County District Attorney's Office had complained to the Riverside County Coroner's Office about the quality of Dr. Hunter's work and testimony. (See pt. II.C.2., *ante*.) After the jury returned its verdict, defendant filed a motion to discover materials pertaining to Dr. Hunter's competence and credibility, including concerns regarding those matters expressed by members of the Riverside County District Attorney's Office.

The trial court allowed defendant to subpoena and examine under oath County Coroner Raymond Carillo, regarding complaints made to him by the district attorney's office about Dr. Hunter's competence, and his discussions with Dr. Hunter regarding those complaints. The prosecutor also produced three interoffice memoranda by prosecutors in the district attorney's office about Dr. Hunter's credibility. One of those memoranda, by Attorney Randall White, stated: "In a number of homicide cases in which the pathologist has been Dr. Dewitt Hunter, the prosecution has been hampered by gross errors committed by the examiner." The memorandum then described two such cases. Defendant asked for information regarding other cases in which White believed Dr. Hunter had committed "gross errors." The trial court told defense counsel to speak to White and to report back if White was uncooperative.

At the next court appearance, defense counsel said he had spoken to White, who could not recall any other cases in which Dr. Hunter had committed errors. Defense counsel believed White was not "totally candid" and was "not cooperative." Counsel asked the trial court to order White to prepare a declaration under penalty of perjury, stating that he did not know of other cases involving gross errors by Dr. Hunter. He also asked the court to allow him to question White under oath. The trial court denied both requests.

Defendant challenges these denials. Defendant notes that the prosecution has a duty to disclose to the defense all material evidence favorable to the defense (*Kyles v. Whitley, supra,* 514 U.S. 419, 438 [115 S.Ct. 1555, 1567-1568]; *In re Sassounian, supra,* 9 Cal.4th 535, 543-544) and that this

duty continues after the defendant's conviction (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1260-1261 [275 Cal.Rptr. 729, 800 P.2d 1159]). Here, however, Attorney White told defense counsel that he could not remember any other cases in which Dr. Hunter had committed acts of gross negligence. The trial court did not abuse its discretion (see generally *Hill v. Superior Court* (1974) 10 Cal.3d 812, 816-817 [112 Cal.Rptr. 257, 518 P.2d 1353, 95 A.L.R.3d 820]) in refusing to order White to prepare a declaration or to submit to questioning.

### B. *Motion for New Trial*

Defendant contends the trial court erred in denying his motion for a new trial. We disagree.

"In reviewing a motion for a new trial, the trial court must weigh the evidence independently. (*People v. Serrato* (1973) 9 Cal.3d 753, 761 [109 Cal.Rptr. 65, 512 P.2d 289].) It is, however, guided by a presumption in favor of the correctness of the verdict and proceedings supporting it. (*People v. Martin* (1970) 2 Cal.3d 822, 832 [87 Cal.Rptr. 709, 471 P.2d 29].) . . . [¶] A trial court has broad discretion in ruling on a motion for a new trial, and there is a strong presumption that it properly exercised that discretion." (*People v. Davis, supra,* 10 Cal.4th 463, 523-524.)

Defendant argues the trial court should have granted his motion for new trial on the ground that the evidence was insufficient to support the jury's verdict. He faults the trial court for failing to decide whether there was substantial evidence to support the prosecutor's two-beating theory. But the trial court found there was substantial evidence to support the prosecutor's alternate theory that defendant had entered Jones's house with the intent to rob him, and that defendant killed Jones to accomplish that goal. As explained earlier (see pt. II.C.1.d., *ante*), the record supports the trial court's finding. Therefore, there was no need for the trial court to decide whether the evidence was sufficient to support the two-beating theory.

Defendant also contends the trial court should have granted a new trial because (1) it improperly ordered defendant shackled without a finding of "manifest need" (*People v. Duran, supra,* 16 Cal.3d 282, 290-291); (2) the prosecution withheld material evidence pertaining to Dr. Hunter's competence; (3) the prosecutor committed misconduct by misrepresenting the accuracy and reliability of Dr. Hunter's testimony. As we have already explained, none of these grounds warranted a new trial. (See pts. II.C.2., II.C.4., II.D.1., *ante*.)

Defendant asserts the prosecutor committed misconduct at the hearing on the new trial motion by mischaracterizing the evidence at trial and by

expressing his personal belief that the jury, simply by looking at the photographic evidence could have found that defendant beat Jones in two different places, without consideration of Dr. Hunter's testimony. We disagree. The prosecutor simply gave his view of the evidence. There is no evidence of the prosecutor's deliberate misrepresentation of the truth. (*Miller v. Pate* (1967) 386 U.S. 1, 6 [87 S.Ct. 785, 787, 17 L.Ed.2d 690].)

### C. *Defense Motion to Modify Death Verdict*

 Defendant contends the trial court committed several errors at the hearing on his motion to modify the death sentence. (§ 190.4, subd. (e).) As we explain below, his claims lack merit.

#### 1. *Trial court's alleged failure to understand its duties*

Defendant contends that when the trial court ruled on his modification motion, it was required to explicitly discuss all relevant mitigating circumstances, including those it found insufficient to warrant leniency, and here it failed to do so. The court, however, was under no such obligation. Although it had to independently reweigh all of the evidence, including all the mitigating evidence the defense presented at trial (*People v. Edwards, supra,* 54 Cal.3d 787, 847), and to describe its reasons for denying the modification motion with sufficient specificity to permit appellate review (*People v. Rodriguez* (1986) 42 Cal.3d 730, 794 [230 Cal.Rptr. 667, 726 P.2d 113]), its description did not have to include a discussion of each relevant mitigating circumstance. (See generally *People v. Memro* (1995) 11 Cal.4th 786, 885 [47 Cal.Rptr.2d 219, 905 P.2d 1305].)

Equally meritless is defendant's assertion that the trial court refused to consider all of his mitigating evidence. As the court explained after hearing defendant's argument: "We just don't have the time, nor is it necessary, to get into every single item." The court never said it would not *consider* all of defendant's mitigating evidence, only that there was no need to *discuss* every item. The court explained why it gave relatively little weight to defendant's evidence, and why it found the prosecutor's argument in support of the death penalty more compelling. Nor does the record support defendant's claim that the court never considered the cumulative weight of his mitigating evidence, but only rejected it piece by piece.

Defendant argues the trial court violated the requirement that a ruling on a modification motion be based entirely on the evidence at trial (§ 190.4, subd. (e); *People v. Williams* (1988) 45 Cal.3d 1268, 1329 [248 Cal.Rptr. 834, 756 P.2d 221]) because, before ruling on the motion, the court heard

statements from the victim's family. In ruling on the motion, however, the court stressed that its ruling was based on "the mitigating and aggravating circumstances shown by the evidence." And in its statement of reasons supporting denial of the motion, the court cited solely evidence presented at trial, making no reference whatsoever to statements by the victim's family. Although the court should not have heard those statements, they did not play a significant role in the court's denial of the motion. (See *People v. Howard* (1992) 1 Cal.4th 1132, 1194 [5 Cal.Rptr.2d 268, 824 P.2d 1315]; *People v. Ramirez* (1990) 50 Cal.3d 1158, 1201-1202 [270 Cal.Rptr. 286, 791 P.2d 965].)

Acknowledging the trial court's finding that the circumstances in aggravation outweighed the circumstances in mitigation, defendant asserts this was legally insufficient because of the court's failure to find that the aggravating circumstances "substantially" outweighed the mitigating circumstances. The court had no duty to make such a finding. (See § 190.4, subd. (e).)

Defendant argues the trial court improperly "double-counted" the circumstances of the offense as an aggravating factor. In support, he notes that in explaining why a sentence of death was justified here, the court mentioned both the vulnerability of the elderly victim and the savagery of the attack. In so doing, the court did not engage in double-counting; rather, it merely mentioned two aspects of the murder to explain its conclusion that the circumstances of the offense warranted the death penalty.

Defendant claims the court erred in agreeing with the prosecutor that the background and psychological evidence presented by defendant was aggravating. The prosecutor merely pointed to certain aspects of that evidence to show that defendant's background and alleged mental disabilities did not mitigate the seriousness of the crime. The argument was proper; thus, the court's acceptance of it was not error.

Defendant asserts that, by describing the murder as "exceptionally brutal" and "cruel," the trial court impermissibly applied the "heinous, atrocious and cruel" standard, which was held to be unconstitutionally vague (see *Maynard v. Cartwright* (1988) 486 U.S. 356, 363-364 [108 S.Ct. 1853, 1858-1859, 100 L.Ed.2d 372]), and used it here as a separate aggravating factor. The court merely used these descriptive terms in explaining why the circumstances of the offense was a factor in aggravation. (See *People v. Lucero, supra,* 23 Cal.4th 692, 737 [rejecting similar contention].)

2. *Ex parte request that prosecutor prepare final judgment*

Before sentencing defendant to death, the trial judge mentioned that "a long time ago before I had any idea how this was going to turn out," he had

asked the prosecutor to draft an order reciting a death sentence, in the event there was such a judgment. The court then sentenced defendant to death by reading the order drafted by the prosecutor.

Defendant now accuses the trial court of prejudging his motion for a new trial and to modify the sentence of death, rendering the hearing on the motion a sham, and violating his rights under the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. We disagree. The trial court's apparent goal was simply to ensure that, *if* it decided to sentence defendant to death, it could do so without any technical omissions in the pronouncement of sentence. Its request for the prosecutor's assistance in achieving this goal does not show that it prejudged the matter.

Defendant also complains that by asking the prosecutor to draft the order, the trial court improperly engaged in ex parte communications concerning a pending matter. A trial court may engage in ex parte communications for "scheduling, administrative purposes, or emergencies that do not deal with substantive matters," so long as it reasonably believes the communication will not benefit the party consulted, and the opposing party is promptly notified and given a chance to respond. (Cal. Code Jud. Ethics, canon 3B(7)(d).) Here, the record does not disclose the circumstances under which the court asked the prosecutor to prepare the order, and it may well have done so in the presence of defense counsel. There is no evidence before us of improper conduct by the trial court.

### D. *Ineffective Assistance of Counsel*

■ Defendant argues his trial counsel was ineffective in several respects. To prevail on a claim of ineffective assistance of counsel, a defendant "must establish not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice." (*People v. Bolin* (1998) 18 Cal.4th 297, 333 [75 Cal.Rptr.2d 412, 956 P.2d 374].) Prejudice occurs only if the record shows "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington, supra,* 466 U.S. 668, 694 [104 S.Ct. 2052, 2068].) "When . . . the record sheds no light on why counsel acted or failed to act in the manner challenged, the reviewing court should not speculate as to counsel's reasons. . . . Because the appellate record ordinarily does not show the reasons for defense counsel's actions or omissions, a claim of ineffective assistance of counsel should generally be made in a petition for writ of habeas corpus, rather than on appeal." (*People v. Diaz, supra,* 3 Cal.4th 495, 557-558.)

### 1. *Underfunding of the public defender's office*

Defendant claims the Riverside County Public Defender's Office, which represented him in this case, was overburdened, understaffed and undertrained. This "systematic underfunding," he asserts, violated his right to the effective assistance of counsel, as guaranteed by the federal and California Constitutions. But the record contains no evidence of the alleged underfunding.

Defendant points out that his public defender asked for several continuances because of schedule conflicts. Such conflicts are an ordinary part of criminal practice, however; they are not proof that the public defender representing him was overworked or that the entire office was underfunded. Defendant chiefly bases his claim on grand jury reports and newspaper articles that are not part of the record in this case. Any contention based on these materials can be raised only in a habeas corpus petition. (*People v. Bean, supra,* 46 Cal.3d 919, 944.)

### 2. *Incompetent voir dire*

Defendant argues that his trial counsel "rushed through" the last days of voir dire, and that his examinations were often "cursory at best." The voir dire examination of prospective jurors in this case, however, was quite long, lasting more than a month and consuming more than 3,000 pages of transcript. Defense counsel examined the prospective jurors at length, asking far more questions than the prosecutor.

Defendant faults his trial counsel for not challenging Juror F. for cause. F., an elderly retired junior high school teacher, said the segregationist attitude prevalent in her hometown during her childhood was ingrained in her even if she was not consciously aware of it. Although she liked to think that she no longer had that attitude, she was unable to say "what would pop out under certain stress." Thus, she could not say definitely whether that attitude would affect her view of the evidence. Ultimately she concluded: "I like to feel that I could give anyone a fair trial . . . ." F. was selected as an alternate juror and ultimately replaced a juror who was excused during the trial.

Defendant maintains his counsel should have challenged F. for cause, claiming she admitted racial bias. Even if we were to assume the trial court would have granted the challenge, defense counsel was not incompetent for failing to make it, because he could reasonably have believed F.'s comments showed that she would bend over backwards to be fair.

### 3. Failure to seek continuance

Defendant accuses that his trial counsel of incompetence for his failure to seek a continuance when he first learned of the prosecution's two-beating theory. (See pt. II.C.1., *ante*.) According to defendant, counsel made no attempt to investigate that theory until after the testimony of Dr. Hunter, the prosecution's expert witness.

But it is not clear from the record when defense counsel first investigated the two-beating theory. Furthermore, assuming for the sake of argument that a reasonably competent counsel would have sought a continuance and that the trial court would have granted it, the record before us provides no evidence of a reasonable probability that the trial's outcome would have been different had counsel sought and obtained such a continuance.

### E. Alleged Judicial Bias

Defendant asserts that Judge George Grover, who presided over the trial, was biased against him, and the judge's hostility towards him persisted through jury selection, trial, and posttrial proceedings. He points to Judge Grover's off-the-record discussions with law enforcement personnel about whether defendant should be shackled, his trip to the county clerk's office to locate records of one of defendant's prior convictions, his ex parte request to the prosecutor for a draft of a judgment imposing the death sentence, his assistance to the prosecutor by holding up an exhibit that the prosecutor was displaying to the jury, and comments he made throughout the trial and at the hearing on the motion for modification of the death sentence.

Defendant has not preserved this claim for review because he failed to object to the allegedly improper acts and never asked the judge to recuse himself. (*People v. Hines, supra*, 15 Cal.4th 997, 1040-1041.) Furthermore, after carefully reviewing the record we find no evidence that Judge Grover was biased against defendant.

### F. Missing Record

During the trial, the court's file containing pleadings and other documents relating to defendant's case was lost, possibly because the custodial staff erroneously believed it was to be thrown away. Additional documents, including the jury instructions and certain trial exhibits, were inadvertently discarded after trial. The court was able to reconstruct most of its trial file from copies of documents obtained from the parties. Nevertheless, certain documents remain missing. Defendant contends the absence of

these trial records violates the Eighth and Fourteenth Amendments to the federal Constitution. (See generally *People v. Howard, supra,* 1 Cal.4th 1132, 1166.)

A defendant in a criminal case is entitled to an appellate record adequate to permit "meaningful appellate review." (*People v. Scott* (1997) 15 Cal.4th 1188, 1203 [65 Cal.Rptr.2d 240, 939 P.2d 354]; see also *People v. Bradford* (1997) 15 Cal.4th 1229, 1381-1382 [65 Cal.Rptr.2d 145, 939 P.2d 259]; *People v. Freeman, supra,* 8 Cal.4th 450, 509-510.) "The record on appeal is inadequate, however, only if the complained-of deficiency is prejudicial to the defendant's ability to prosecute his appeal." (*People v. Alvarez* (1996) 14 Cal.4th 155, 196, fn. 8 [58 Cal.Rptr.2d 385, 926 P.2d 365].)

Defendant first complains that the record contains neither the endorsed written jury instructions at the guilt and penalty phases nor the special instructions defendant requested at the guilt phase, and that the instruction conferences were not transcribed. It appears, however, that the trial court did not provide written instructions but read the instructions to the jury. The record does include a transcript of the oral instructions, so the written instructions are not essential to our review. With regard to the instruction conferences, the record shows that the trial court summarized them at length, giving defense counsel the opportunity to mention objections he had made to the instructions during conference. (See *People v. Freeman, supra,* 8 Cal.4th 450, 510 [holding that this procedure did not deny the defendant meaningful appellate review].) Moreover, to ensure that defendant will not be prejudiced by this incomplete record, we have not rejected any claim of instructional error on the ground that defendant failed to object to the instruction or that he failed to propose appropriate additional instructions.

Defendant contends he was prejudiced by the loss of three lists of qualified jurors, prepared by the jury commissioner's staff for use during the peremptory challenge phase of jury selection. He argues these lists, designated as exhibits at trial, were relevant to his claim that the jury selection process was not random and therefore improper. (See pt. II.B.5., *ante.*) As we have explained, however, defendant waived his challenge to the selection process. (*Ibid.*) Because we do not consider the merits of this claim, the jury lists in question are unnecessary for our review.

Defendant argues he has been prejudiced because the master jury list prepared by the Riverside Jury Commissioner's Office in 1988 was destroyed before the appointment of his appellate counsel. Consequently, he contends, appellate counsel is unable to raise a constitutional challenge to the jury based on the master list. Even if that list had been preserved,

however, defendant could not have raised such a challenge on appeal because of his failure to do so at trial.

Defendant also asserts that at an untranscribed hearing the trial court refused to add to the jury questionnaire a question about the race of the prospective jurors. Assuming for the sake of argument that the trial court made such a ruling, it did not preclude defendant at trial from objecting to the panel on the ground that certain racial or ethnic groups were underrepresented or from describing for the record the racial and ethnic makeup of the panel. Because he did not do so, he has forfeited any possible claim on appeal that the panel was racially or ethnically unbalanced. Thus, the absence of any transcript of the hearing in question has not deprived defendant of meaningful review of the judgment.

Defendant also complains his right to an adequate record was violated because the trial court held at least 12 unreported conferences, some of them at the bench and some of them in chambers during jury selection. The trial transcript before and after the conferences indicates that they generally involved routine, nonsubstantive matters such as scheduling and corrections of the trial court's notes. One unreported conference concerned the questions that would be asked on the jury questionnaire, and one was held to discuss a prospective juror's difficulty in understanding English, after which the parties stipulated that the trial court could excuse the prospective juror. Although conferences at the bench and in chambers are generally not reported in noncapital trials, section 190.9 requires that they be reported in capital cases. Apparently, neither the trial court nor counsel was aware of this statutory provision.

It is important that trial courts "meticulously comply with Penal Code section 190.9, and place all proceedings on the record." (*People v. Freeman, supra,* 8 Cal.4th 450, 511.) Failure to do so, however, does not require reversal of a defendant's conviction unless the failure to transcribe the proceedings in question is "prejudicial to the defendant's ability to prosecute his appeal." (*People v. Alvarez, supra,* 14 Cal.4th 155, 196, fn. 8.) Here, defendant has shown no realistic possibility that anything that occurred during the unreported conferences could have resulted in reversal of the judgment. Thus, he has not demonstrated that the record on appeal is inadequate to permit meaningful review. (*People v. Freeman, supra,* at p. 509.)

Defendant asserts that the record does not contain minute orders from his court appearances on July 31, 1987, and August 31, 1988. The August 31, 1988 minute order is in the clerk's transcript, and the reporter's transcript

provides an adequate record of the July 31, 1987 proceedings. Defendant also asserts that on July 31, 1987, the trial court issued a discovery order that has been lost. In our discussion of defendant's claims pertaining to the question of discovery (see pt. III.B., *ante*) we have assumed for the sake of argument that the trial court issued an order consistent with its comments in the oral proceedings on that date. The existence of a written order has no bearing on our discussion of those claims.

Defendant argues he has suffered prejudice because the record does not contain two motions to continue the case that he filed in January and July, 1988, both of which were granted. According to defendant, these motions could have substantiated his contention that his public defender's alleged failure to adequately investigate defendant's case was the result of counsel's "overwhelming caseload and client conflicts." The record, however, does not show that counsel's investigation was inadequate, and it is inconceivable that the continuance motions could have established such inadequacy.

Defendant claims prejudice from the loss of two trial exhibits (a sample of blood taken from the sink in defendant's bathroom and a chart used by a prosecution witness to explain her blood analysis to the jury) and 14 exhibits from the preliminary hearing (12 photographs, a death certificate, and records of defendant's prior conviction for robbery). It is inconceivable that the trial exhibits had any bearing on the outcome of defendant's trial, because they were relevant only to the identification of defendant as Jones's killer, and defendant admitted killing Jones. With respect to the preliminary hearing exhibits, defendant cannot now challenge their admissibility because any error in admitting them could not have "resulted in denial of a fair trial or otherwise affected the judgment." (*People v. Crandell* (1988) 46 Cal.3d 833, 855 [251 Cal.Rptr. 227, 760 P.2d 423].) In any event, there was ample evidence to support the order holding defendant to answer regardless of what appeared in the 14 preliminary hearing exhibits.

Defendant asserts the trial court obtained "secret information" by holding what he describes as "ex parte . . . hearings" with law enforcement officers to determine whether to shackle defendant. There is no evidence that the court conducted any such hearings. The record, however, contains a statement by the trial court that it had discussed the shackling issue with law enforcement officers. Whatever was said in those conversations, it would not have altered our conclusion that the trial court erred in ordering defendant shackled but that the error was harmless. (See pt. II.C.4., *ante*.) Thus, those conversations had no bearing on the outcome of this appeal.

Defendant also claims that the trial court undertook an ex parte investigation of his prior record when it went to the clerk's office to find the record

of one of defendant's prior convictions after defendant had objected that the prosecution had not provided discovery concerning that conviction, and that the court conducted an unreported ex parte proceeding when it asked the prosecutor, before the sentencing hearing, to draft a judgment imposing a sentence of death in the event there would be such a sentence. These acts were essentially clerical in nature and had no effect on the merits of defendant's case. Thus, defendant's right to meaningful appellate review was not compromised.

Finally, defendant argues that the delay in appointing appellate counsel for him and in securing an adequate appellate record violated the federal Constitution's prohibition of cruel and unusual punishment. As we have explained in the past, such delays are inherent in the process and are not grounds for finding that either the death penalty itself or the process leading to it is cruel and unusual punishment. (See, e.g., *People v. Massie* (1998) 19 Cal.4th 550, 574 [79 Cal.Rptr.2d 816, 967 P.2d 29].) And contrary to defendant's contention, the delay did not violate his right to due process of law. (*People v. Welch* (1999) 20 Cal.4th 701, 775-776 [85 Cal.Rptr.2d 203, 976 P.2d 754].)

## CONCLUSION

We affirm the conviction and the judgment of death.

George, C. J., Baxter, J., Werdegar, J., Chin, J., and Brown, J., concurred.

Appellant's petition for a rehearing was denied September 26, 2001, and the opinion was modified to read as printed above.